**David L. PRESSMAN, Plaintiff,**

v.

**BRIGHAM MEDICAL GROUP FOUNDATION, INC., Brigham and Women's Hospital, Inc., Defendants.**

**Civil Action No. 92–10463–MLW.**

United States District Court,
D. Massachusetts.

March 12, 1996.

---

Harold L. Lichten, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, MA, for David L. Pressman.

William B. Koffel, Foley, Hoag & Eliot, Michael J. Racette, Frank E. Reardon, Hassan & Reardon, Boston, MA, for Brigham Medical Group Foundation, Inc., Brigham & Women's Hospital.

### *MEMORANDUM AND ORDER ON MOTION OF DEFENDANTS, BRIGHAM & WOMEN'S HOSPITAL, INC., AND BRIGHAM MEDICAL GROUP FOUNDATION, INC. FOR SUMMARY JUDGMENT (# 47)*

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

The plaintiff, David L. Pressman, filed a ten-count complaint alleging claims for breach of contract (Count I), promissory estoppel (Count II), age discrimination under federal and state law (Counts III, IV and V), handicap discrimination under federal and state law (Counts VI, VII and VIII) and violation of his right to privacy and confidentiality of his medical records under state law (Counts IX and X) against the defendants, Brigham Medical Group Foundation, Inc. (hereinafter "Brigham Medical Group") and Brigham and Women's Hospital, Inc. (hereinafter "Brigham & Women's Hospital"). Following extensive discovery, the defendants filed the instant motion for summary judgment, seeking the entry of judgment as a matter of law on all counts of the plaintiff's complaint. As might be expected, the plain-

tiff opposes the dispositive motion. The record is now complete and, with oral argument having been heard in January of this year, the motion for summary judgment is in a posture for decision.[1]

## II. THE FACTS

In large measure, the pertinent facts are not contested. David L. Pressman is a medical doctor. The plaintiff graduated from Harvard University and Columbia University School of Medicine in 1957 and 1961 respectively. He performed his internship at Boston City Hospital, his residency at the Boston V.A. Hospital and, thereafter, a cardiology fellowship at Beth Israel Hospital/Harvard Medical School in 1963–64. Dr. Pressman completed his residency in internal medicine at Mount Sinai Hospital in New York and subsequently became board certified in that specialty.

For approximately twenty-two years, from 1965 through 1987,[2] Dr. Pressman maintained a solo practice specializing in internal medicine and cardiology in Arlington, Massachusetts. Having made the determination to relocate, in September of 1987, the plaintiff moved his practice to Cape Cod. However, when Dr. Pressman was unable to secure the necessary cross-coverage from other local physicians required to maintain his practice, in late October, 1987, he resigned his privileges from Cape Cod Hospital and closed his practice.

On or about November 12, 1987, the plaintiff suffered a myocardial infarction. He was transferred from Cape Cod Hospital to Brigham & Women's Hospital in Boston where he underwent emergency cardiac catheterization and angioplasty. Dr. Gilbert Mudge was the plaintiff's treating cardiologist at Brigham & Women's Hospital, while Dr. Kirschenbaum performed the surgical procedure. On November 20, 1987, the plaintiff was transferred from Brigham & Women's Hospital to Massachusetts General Hospital to be examined by the Director of the Cardiac Catheterization Unit at that facility; Dr. Pressman was discharged from the hospital on November 23, 1987.

In January, 1988, the plaintiff applied for, and began receiving, disability payments under his private disability policy with the Provident Life and Accident Insurance Company. The record reflects that Dr. Pressman considered the dates of his total disability to be at least from November 27, 1987 through January 7, 1993, the date of the last Insured's Supplementary Statement of Claim signed by David Pressman, M.D., that has been submitted by the defendants.

According to the plaintiff, he made an excellent recovery from his heart condition.[3] From 1988 to 1990, Dr. Pressman worked as a medical consultant to insurance companies, including Harvard Risk Management and Joint Underwriter's Association. Following a job search that began in 1988, on or about November 20, 1990, Dr. Pressman was offered a clinical position as a primary care physician in internal medicine with Harvard Community Health Plan at a starting salary of $112,000.00 plus fringe benefits worth $25,000.00 annually. The plaintiff was granted several months to consider the offer. Since the position was at the Harvard Com-

---

1. With the parties' consent, this case has been referred and reassigned to the undersigned pursuant to 28 U.S.C. § 636(c) for all purposes, including trial and the entry of judgment.

2. The dates are taken from the plaintiff's Statement of Material Facts As To Which There Is A Genuine Dispute Or Which Support Plaintiff's Claims. (#65) In his affidavit, Dr. Pressman states "[f]rom 1965 to the end of 1987 and into early 1988, I maintained a solo private medical practice in Arlington, Massachusetts ..." (Exhibits to Plaintiff's Memorandum # 52, Exh. A, Affidavit of David L. Pressman, ¶ 5) The plaintiff's Curriculum Vitae reads "Clinical Practice: Solo private practice, Arlington, MA:1965–1988." (Memorandum of Law in Support # 49, Exh. 1)

3. Plaintiff states that by the winter of 1987–88, his treating cardiologist, Dr. Mudge, had only restricted him from a solo practice of cardiology requiring regular night emergency room coverage. However, apart from a letter dated January 30, 1988 written by the plaintiff himself to his private insurance company, the earliest date in the records to which reference is made is a letter dated June 22, 1988 from Dr. Mudge to the plaintiff. In October, 1988, Dr. Mudge did opine that Dr. Pressman should not undertake night call duty as is required of a clinical cardiologist. (Exhibits # 52, Exh. X)

munity Health Plan facility in Nashua, New Hampshire, the plaintiff and his wife began looking for homes in that area.

In November, 1990, an advertisement ran in the New England Journal of Medicine announcing an internist position with the defendant Brigham Medical Group which was planning to open a suburban satellite clinical practice in Chestnut Hill, Massachusetts. Dr. Pressman forwarded a letter and resumé in response to the advertisement and, shortly thereafter, was contacted by Dr. Harold Solomon, the physician who was to head the new practice, to come in for an interview. The plaintiff met with Dr. Solomon on November 27, 1990.

According to Dr. Pressman, during the interview he told Dr. Solomon about his twenty plus years of private practice experience in Arlington, his failed attempt to open a practice on Cape Cod in late 1987, his consulting work that began in 1988, and his outstanding offer from Harvard Community Health Plan. Upon request, the plaintiff provided references. Dr. Solomon explained that the job opening would be with the Brigham Medical Group, a practice comprised of approximately thirty internists who were associated with Brigham & Women's Hospital. The position was also to include a faculty appointment as a clinical instructor at Harvard Medical School. Three days after the interview, in a letter dated November 30, 1990, Dr. Solomon wrote to the plaintiff, stating

> ... [Y]our credentials and demeanor would fit in quite nicely ...
>
> As I told you before I could not offer you a starting stipend anywhere near the HCHP offer, but if you and I could reach a satisfactory financial arrangement and you would wait until May we might be able to continue the dialogue.

Exhibits # 52, Exh. H.

On December 12, 1990, Dr. Pressman interviewed with the Director of the Department of Medicine at Brigham & Women's Hospital, Dr. Anthony Komaroff. According to the plaintiff, the meeting went quite well, and he was told by both Dr. Komaroff and Dr. Solomon that Dr. Komaroff agreed that he should be hired. In his affidavit, Dr. Pressman further states that neither physician indicated that any further interviews were required to complete the hiring process. At his deposition, Dr. Komaroff testified that he was concerned about the length of time that Dr. Pressman had been out of practice; in reply to specific questioning during his interview, the plaintiff advised Dr. Komaroff that he had been out of the practice of medicine for roughly a year and a half.

On December 18, 1990, Dr. Pressman returned a telephone call from Dr. Solomon. According to the plaintiff, in the ensuing conversation, they discussed the specifics of a job offer for a position with the Brigham Medical Group, the details of which included the minimum annual salary guarantee, the fringe benefit package, additional income incentives and potential future equity ownership. In the plaintiff's rendition of the conversation, Dr. Solomon explicitly assured him that the offer was definite since it had been approved by Dr. Komaroff, the director of the department,[4] and further that credentialing was merely a formality. Dr. Solomon also purportedly asked Dr. Pressman to refuse the job offer from Harvard Community Health Plan. The plaintiff avers that as a direct consequence of this conversation, he communicated with Harvard Community Health Plan and turned down its offer of employment that same day. Dr. Pressman also allegedly accepted the offer to practice with the Brigham Medical Group.

The plaintiff contacted Dr. Solomon on February 4, 1991, and requested some written confirmation of the job so that he and his wife could start looking for housing in the Boston area. Two days later, Dr. Solomon wrote a letter to Dr. Pressman, the text of which reads as follows:

---

4. According to the deposition testimony of Dr. Solomon, in 1991, it was the chief of medicine, Dr. Eugene Braunwald, who had responsibility for hiring decisions at the Brigham Medical Group. The department heads would submit or nominate candidates, but Dr. Braunwald would ultimately make the hiring decision. (Memorandum of Law # 49, Exh. 2 at pp. 7, 9) Dr. Komaroff similarly testified that neither he nor Dr. Solomon were empowered to make offers of employment. (Memorandum of Law # 49, Exh. 8 at pp. 38-9)

This letter will acknowledge our intent to have you join our practice at the Brigham and Women's Hospital and become a faculty member at Harvard Medical School. It is my intent to begin this relationship as soon as we can complete the credentialing process at the Brigham and Women's Hospital. I have forwarded letters to Dr. Eugene Braunwald, Chairman of our department, and Anthony Komaroff, Director of the general medicine department. I trust this letter will be sufficient for you to begin your plans to return to Boston.

Exhibits # 52, Exh. M.

According to Dr. Solomon, he authored this letter based upon the plaintiff's representation that he was having trouble signing a lease absent some statement of employment. Dr. Solomon testified that he made it very plain to Dr. Pressman at the time that he had not been offered a job, that the credentialing process had to be completed and that the hiring decision had to be made by Dr. Braunwald.

On February 12, 1991, both Dr. Solomon and Dr. Komaroff sent letters to Dr. Braunwald, respectively nominating Dr. Pressman for appointment to the staff and inquiring if an offer could be made to him. During the month of February, Dr. Pressman had several conversations with Dr. Solomon and members of his office staff relating to a variety of topics such as gathering necessary information to notify insurance companies and government agencies of his new position, notification of old clients, patient scheduling issues, and so forth.

In late April, 1991, official insurance and credentialing forms were forwarded from Dr. Solomon's office to the plaintiff to be completed and returned. On May 6, 1991, Dr. Pressman and his wife moved from Cape Cod to Winchester, Massachusetts. Between May 7th and May 20th, the plaintiff filled out and returned the credentialing forms as well

as agreements which permitted the Brigham Medical Group to bill for his services.

On June 4, 1991, Dr. Pressman was interviewed by Dr. Braunwald. According to Dr. Braunwald, he learned for the first time during this interview that Dr. Pressman had not practiced medicine for three and a half years. Dr. Braunwald also testified at his deposition that he thought Dr. Pressman had exercised very poor judgment in relocating his established practice to Cape Cod without first ensuring that coverage arrangements were firmly in place.

Six days later, on June 10, 1991, Dr. Solomon told the plaintiff that Dr. Braunwald was concerned and had requested that Dr. Solomon obtain further information about the events that had transpired on the Cape. The next day Dr. Solomon called the plaintiff and asked him about the 1987 angioplasty procedure. According to Dr. Pressman, Dr. Solomon stated that it was poor judgment not to have revealed this cardiac medical history, that Dr. Braunwald was upset about it and also concerned about the plaintiff's age in light of the heart medical history. In his affidavit, the plaintiff states that Dr. Solomon questioned whether Dr. Pressman would get tired midday and want to leave work early; Dr. Solomon also knew other details about his medical condition that the plaintiff asserts could only have been learned by accessing his medical charts or discussing his case with one of his treating physicians.[5] Dr. Solomon also allegedly said that he had met with Dr. Braunwald, Dr. Komaroff, Dr. Nesson, the president of the hospital, and the hospital lawyer, and that they were considering changing the plaintiff's appointment to a provisional one. Dr. Pressman contends that he rejected the idea of a provisional appointment the next day during another telephone conversation with Dr. Solomon.

On June 14, 1991, while his wife was undergoing surgery at Brigham & Women's Hospital, Dr. Pressman went to the Department of Medicine and requested that he be

---

5. In a letter dated June 18, 1991 to Dr. Braunwald, Dr. Solomon appears to imply that he obtained information concerning the plaintiff's cardiac catheterization and angioplasty in a conversation with Dr. Herbert Mathewson, president of the medical staff at Cape Cod Hospital. During his deposition, Dr. Solomon testified that he could not recall how or when he first learned of the plaintiff's heart condition.

given an identification badge so he could familiarize himself with the hospital since he would soon be working there. The plaintiff showed members of the staff a copy of Dr. Solomon's February 6th letter, and explained that he was going through the credentialing process. Three hospital employees submitted written accounts of their encounters with the plaintiff that day to the administrator of the Department of Medicine. Dr. Braunwald testified that Dr. Pressman's actions in requesting an identification card when he was not a member of the staff was bizarre and inappropriate behavior.

According to the plaintiff, on June 17, 1991, Dr. Solomon advised him that Dr. Braunwald denied him privileges. Dr. Pressman never received a written communication explaining why the privileges were denied or providing him with any avenue of appeal.

### III. THE SUMMARY JUDGMENT STANDARD

The summary judgment standard in this Circuit is familiar. When considering the propriety of the entry of summary judgment, the Court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the Court is to examine the materials presented "in the light most favorable to the nonmoving party and indulge in all inferences in that party's favor." *Moody v. Boston and Maine Corporation*, 921 F.2d 1, 5 (1 Cir., 1990) (citation omitted); *Casas Office Machines Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 684 (1 Cir., 1994).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine" the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id., see also National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1 Cir., 1995); *Vasapolli v. Rostoff*, 39 F.3d 27, 32 (1 Cir., 1994). In weighing whether a factual dispute is "material" the Court must examine the substantive law of the case, for "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *National Amusements*, 43 F.3d at 735; *Vasapolli*, 39 F.3d at 32.

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the Supreme Court:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also National Amusements*, 43 F.3d at 735.

Moreover,

> [e]ven in cases where elusive concepts such as motive and intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

*Rivera–Cotto v. Rivera*, 38 F.3d 611, 613 (1 Cir., 1994) quoting, *Medina–Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d 5, 8 (1 Cir., 1990); *see also Mesnick v. General Electric Company*, 950 F.2d 816, 822 (1 Cir., 1991).

### IV. DISCUSSION

The issues shall be addressed in the order presented by the defendants in their memorandum of law.

**522**

### A. Counts III, IV, V, VI, VII and VIII

■ Initially, the defendants argue that all the plaintiff's claims for age and handicap discrimination must fail because Dr. Pressman cannot prove that he was qualified or "otherwise qualified" for the position he sought as required to establish a prima facie case of unlawful discrimination. The factual predicate for this argument is that the plaintiff had submitted disability claim forms to his private insurance company and had been receiving disability payments since 1988.

As support for their position, the defendants rely on the decision in *August v. Offices Unlimited, Inc.*, 981 F.2d 576 (1 Cir., 1992). In that case the plaintiff August alleged that his termination from his job as an office furniture salesman constituted a discriminatory discharge on the basis of a handicap. According to his physician, August suffered from major depression which rendered him totally disabled. On appeal from the entry of summary judgment, the First Circuit wrote:

> ... the record is nonetheless fatally bereft of indication that August possessed the ability to perform his job. The record indicates that from approximately March 24, 1989, until the time this case was argued, August was simply incapable of performing the essential functions of any job, let alone a furniture sales position at OUI. This fact was established by August's own sworn statements on numerous disability insurance claim forms, in which he asserted that he was totally and continuously disabled from March 24, 1989, onward. Written statements signed by his psychiatrist, Dr. Wallace, verify his total disability.

*August*, 981 F.2d at 581 (footnote omitted). Observing that the term "total disability" as defined in August's insurance policy was not found in the evidence, the Court determined that "[u]nder any definition of the term, August's declaration that he was "totally disabled" means that he was not able to perform the essential functions of his job ..." *Id.* The Court noted other facts, uncontested by the plaintiff, that bore out this conclusion, including a statement by his attorney that August was incapable of returning to work. *Id.* at 582. According to the Court, "there is no evidence from which to infer that August was not completely and totally disabled since the last week in March 1989 ..." *Id.*

The documentary evidence in the instant case reveals that in his original statement of claim in January of 1988, the plaintiff wrote that he was "still totally disabled." (Memorandum of Law # 49, Exh. 7) His attending physician, Dr. Mudge, signed this form. (*Id.*) Similarly, on each of the supplementary statements of claim submitted by Dr. Pressman, he completed line 5 as follows: "Dates of total disability: From 11/27/87 thru present." (*Id.*) Having consistently claimed that he was totally disabled, the defendants assert that under the *August* case, the plaintiff is estopped from contending that he was qualified, or "otherwise qualified," for a position with the Brigham Medical Group.

The record in the present case is not as clear as it seems to have been in the *August* case. Dr. Pressman states in his affidavit that under his private disability plan, he was entitled to receive total benefits even though he could still practice medicine if he had limitations imposed upon the practice of his sub-specialty of cardiology. (Exhibits # 52, Exh. A ¶ 53) At the time he took out the insurance in the early 1970s, the plaintiff avers that his insurance agent assured him that he could receive total benefits in the absence of complete disability so long as there was some medical restriction on his ability to practice all aspects of his sub-specialty. (*Id.*) Dr. Pressman contends that he also received written confirmation of this definition of "total disability" from the insurance company. (Exhibits # 52, Exh. V)

A notation dated June 7, 1991 from an insurance company doctor on an internal Provident Life and Accident Insurance Company correspondence states "He (Dr. Pressman) is unable to perform the duties of a practicing internist-cardiologist in solo private practice." (Exhibits # 52, Exh. W) Dr. Pressman argues that his treating physician, Dr. Mudge, also uniformly only limited his ability to practice as a clinical cardiologist with emergency room responsibilities. (Exhibits # 52, Exh. X) Further, in his original

cover letter to the insurance company seeking disability payments dated January 30, 1988 which is thereafter referenced in each of the subsequent supplementary statement of claim forms, Dr. Pressman indicated his inability to perform emergency room obligations, and that all currently advertised positions either required such duties or other skills that he did not possess. (Memorandum of Law # 49, Exh. 17)

Further, in his affidavit, the plaintiff states that, after recovering from his myocardial infarction

> ... I was fully capable of performing the job of an internist in a group clinical practice such as with BMG. Dr. Mudge concurred that I could return to work, but that I should try to avoid the type of cardiology practice in which I would have to regularly go to the emergency room late at night in inclement weather conditions, etc. Other than those restrictions, Dr. Mudge encouraged me to practice internal medicine/cardiology.

Exhibits # 52, Exh. A ¶ 54.

Dr. Pressman states that he was capable of practicing with the Brigham Medical Group since it was a group as opposed to solo practice, and because Brigham & Women's Hospital maintained a full nighttime and 24-hour emergency staff. (*Id.*)

On this record, the factual constellation at hand is distinguishable from that in the *August* case.[6] A genuine issue of fact exists as to whether total disability within the definition of Dr. Pressman's insurance policy means that he was unable to perform the essential functions of the practice of medicine. There is evidence dating back to the plaintiff's January, 1988 letter to the insurance company from which it could be inferred that Dr. Pressman did not consider himself to be totally disabled from the practice of medicine. This fact is underscored by Dr. Pressman having sought, and received, an offer of employment from Harvard Community Health Plan. Neither the insurance doctor nor his treating physician appeared to have viewed his limitations so broadly; in all instances, the disability was limited to an inability to conduct a solo practice with emergency room duties. In sum, questions of fact are extant, and the defendants are not entitled to the entry of judgment as a matter of law because Dr. Pressman was not qualified or "otherwise qualified."

Similarly, whether the defendants failed to hire the plaintiff for unlawful discriminatory reasons or for legitimate, non-discriminatory reasons is a subject of dispute. At a minimum Dr. Pressman has averred that he was told by Dr. Solomon that his job offer was jeopardized by his medical history, and his age in light of his medical history. The defendants contend it was because Dr. Pressman exhibited poor judgment, was out of practice too long, behaved inappropriately and received lukewarm recommendations. The evidence raises questions of fact for a jury to decide.

■ As noted in the Court's February 23, 1995 Procedural Order (# 75), in Counts IV and VII of the complaint, the plaintiff alleges claims of discrimination based on age and handicap under Mass.Gen.L. ch. 151B §§ 4 and 4(9), while in Counts V and VIII, comparable claims are asserted under Mass.Gen.L. ch. 93 § 103. The Massachusetts Supreme Judicial Court (SJC) has concluded that Mass.Gen.L. ch. 93 § 103 does not afford a claimant an alternative remedy to those provided by Mass.Gen.L. ch. 151B because

> ..... where applicable, G.L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections, and that the plaintiff's failure to adhere to the requirements of G.L. c. 151B required the dismissal of his complaint.

*Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 586, 631 N.E.2d 555, 559 (1994).

---

**6.** The Court acknowledges that in the case of *D'Aprile v. Fleet Services Corporation,* No. 94-0524 P (D.R.I., filed November 22, 1995), Senior District Judge Pettine who dissented in the *August* decision, concluded that under the *August* rule, a plaintiff who had applied for and received disability benefits on the grounds that she was totally disabled was estopped from asserting that she was "otherwise qualified." The Court does not interpret the *August* case to so firmly close the door to consideration of factors beyond a disability benefits application.

Reaffirming this holding, the SJC thereafter wrote "that if a remedy under G.L. c. 151B is available to a plaintiff, he may not pursue a remedy under G.L. c. 93, § 103." *Agin v. Federal White Cement, Inc.*, 417 Mass 669, 672, 632 N.E.2d 1197, 1199 (1994). Plainly under this precedent, the plaintiff cannot assert identical claims under Mass.Gen.L. ch. 151B and Mass.Gen.L. ch. 93 § 103. As a matter of law, Counts V and VIII shall be dismissed.

### B. Counts IX and X

■ The defendants next seek summary judgment on the plaintiff's claims that they invaded his right to privacy and committed a breach of confidentiality under Massachusetts law, specifically, Mass.Gen.L. ch. 214, § 1B and Mass.Gen.L. ch. 111, § 70E. These claims are premised upon Dr. Pressman's allegation that the defendants reviewed his personal medical records without permission. The defendants argue that the plaintiff has proffered no evidence in support of his claims.

Dr. Pressman admits that he never advised the defendants of his heart condition, yet in June, 1981, Dr. Solomon questioned him about his angioplasty procedure. Further, Dr. Pressman avers that Dr. Solomon confronted him with details of his medical condition and history that were not publicly known. A letter authored by Dr. Solomon on June 18, 1991, reflects that Dr. Solomon became aware that in 1987 the plaintiff had developed angina, was admitted to Brigham & Women's Hospital for cardiac catheterization and angioplasty, and was thereafter transferred to Massachusetts General Hospital for "a second opinion." (Exhibits # 52, Exh. R) Dr. Solomon is unclear about how he came to possess this information. The plaintiff alleges that Dr. Solomon, as a treating physician at Brigham & Women's Hospital, had direct access to his medical records via computer at the hospital. (Exhibits # 52, Exh. D)

Viewing this evidence in the light most favorable to Dr. Pressman, it is plainly sufficient to support an inference that Dr. Solomon reviewed the plaintiff's medical records.

Whether he did so or not is a question of fact.

■ The defendants next contend that as part of the application process, the plaintiff consented to an investigation of his professional competence and signed an Authorization Concerning Appointment To the Brigham and Women's Hospital. (Memorandum of Law # 49, Exh. 11 at p. 13) The defendants point to the first two paragraphs of this form, which provide:

1. I agree to undergo, for cause, a mental or physical examination, if requested, and if there is a known mental or physical impairment, to provide evidence that the impairment does not interfere with my competence to practice medicine.

2. I authorize the Brigham and Women's Hospital to exchange information with any other health care facility and with any professional organization with which I have had any employment, practice, association or privileges within the past ten years ... regarding an assessment of my professional skills, any pending or final disciplinary action, any pending or final malpractice actions, and any other information relevant to my character or my professional competence.

Memorandum of Law # 49, Exh. 11 at p. 13. Neither of these paragraphs can reasonably be read as a consent or authorization by the plaintiff to an unknown review of his medical records at the Brigham and Women's Hospital or as notice that such a review of his records was within the scope of an investigation of his professional competence.

### C. Counts I and II

The two remaining claims are for breach of contract (Count I) and promissory estoppel (Count II). Massachusetts courts have recognized that

The theory of promissory estoppel, as embodied in the Restatement of Contracts § 90 (1932), permits recovery if (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance,

and (3) injustice can be avoided only by enforcement of the promise.

*Loranger Construction Corporation v. E.F. Hauserman Company,* 6 Mass.App.Ct. 152, 154, 374 N.E.2d 306, 308 (1978); *see also Treadwell v. John Hancock Mutual Life Insurance Company,* 666 F.Supp. 278, 286–7 (D.Mass., 1987).

In formally accepting this theory as part of the law of the Commonwealth, the court explained that

> Recovery in these circumstances [under promissory estoppel] requires no more than a promise upon which the promisee would reasonably have placed reliance; and attention is to be focused upon the reasonableness of that reliance.

*Loranger,* 6 Mass.App.Ct. at 159, 374 N.E.2d at 310–11 (footnotes omitted).

The defendants argue that Dr. Pressman's claim under the theory of promissory estoppel must fail as a matter of law because any reliance on the plaintiff's part was unreasonable.

█ Whether Dr. Pressman's reliance on a promise of employment from the defendants was reasonable, or whether he is estopped from recovery under the equitable doctrine of "unclean hands" are questions of fact for the jury to decide based upon the record in this case. Although the defendants contend that Dr. Pressman should have been aware that certain purported inaccuracies in his resume and qualifications would be discovered during the credentialing process so as to render any reliance on a promise of employment unreasonable as a matter of law, the plaintiff avers that he never misrepresented any facts to the defendants. With this state of the evidence, the reasonableness of any reliance quite simply cannot be determined as a matter of law.

█ Turning to the breach of contract claim, the defendants take the alternative positions that first, the February 6th letter to the plaintiff from D. Solomon was not an offer; second, that if it was an offer, it was conditional; and, third, in any event, the offer was never accepted. The plaintiff's breach of contract claim is not quite so narrow. Although the February 6th letter is part of the evidence to support a finding that an agreement was reached, in Dr. Pressman's view, there are many more attendant circumstances.

According to the recited facts, Dr. Pressman contends that on December 18, 1990, he and Dr. Solomon agreed to the specifics of a job offer, including salary, benefits, incentives, etc. During this conversation, Dr. Solomon purportedly offered the plaintiff a position, stating that the offer was definite in that it had been approved by the director of medicine, Dr. Komaroff, and that the credentialing process was a mere formality. Dr. Pressman states that he accepted the offer of employment that day and, having accepted the offer from Brigham Medical Group, he called and declined a job with Harvard Community Health Plan.

Over the next several months, Dr. Pressman maintained extensive contact with Dr. Solomon and his office staff, moved from Cape Cod to Winchester, Massachusetts, completed numerous insurance and credentialing forms, and submitted a list of his former patients.

Once again, based on this record, genuine issues of material fact exist as to whether the parties had reached an agreement, what the terms and conditions of that agreement were and whether that agreement was breached. These issues are not amenable to resolution as a matter of law.

## V. CONCLUSION AND ORDER

Genuine issues of material fact prevent the entry of summary judgment except as to Counts V and VIII. Accordingly, for all of the reasons stated hereinabove, it is ORDERED that the Motion of Defendants Brigham and Women's Hospital, Inc. and Brigham Medical Group Foundation, Inc. for Summary Judgment (# 47) be, and the same hereby is, ALLOWED as to Counts V and VIII, and that said motion be, and the same hereby is, otherwise DENIED.