**Brenda NORRIS, Plaintiff,**

v.

**ALLIED–SYSCO FOOD SERVICES, INC., Defendant.**

**No. C–94–0433 WDB.**

United States District Court, N.D. California.

Dec. 20, 1996.

Daniel Ray Bacon, Law Offices of Daniel Ray Bacon, San Francisco, CA, for plaintiff Brenda Norris.

Richard E. Levine, Levine & Skigen, San Francisco, CA, for defendant Allied–Sysco Food Services, Inc.

OPINION AND ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

BRAZIL, United States Magistrate Judge.

## I. INTRODUCTION

Brenda Norris sued her former employer, Allied–Sysco Food Services, Inc. ("Allied"), alleging numerous claims. A jury trial was held. The jury concluded that sex was a motivating factor in a decision or decisions by Allied to deny Norris promotions, but the jury also concluded that Allied would have

made the same decision or decisions in the absence of the impermissible motivating factor, meaning that Norris was not entitled to damages for sex discrimination. The jury further concluded that Allied violated the Americans with Disabilities Act (ADA) by terminating Norris, and the jury awarded her $300,000 in compensatory damages. The jury found in favor of Allied on all of the plaintiff's other claims.[1]

Viewed in the light most favorable to the plaintiff, the evidence supporting Norris's ADA claim can be briefly summarized as follows. Norris left work on disability due to a back injury and various other ailments in September 1994. Starting around April 1995, Norris asked Allied to permit her to work from home or part-time. Allied either denied this request or took no action on it. Norris remained out on disability until she was terminated in November 1995.

Allied now moves for judgment as a matter of law on Norris's ADA claim, or, in the alternative, for a new trial on the ADA claim. The arguments that Allied makes in support of this motion can be grouped into three general areas. First, Allied argues that Norris did not present sufficient evidence to enable a reasonable jury to conclude that Norris established the essential elements of her claim that she was terminated in violation of the ADA. Second, Allied contends that the jury's answer to one of the special interrogatories submitted to it represents a finding by the jury that Norris did not ask to be accommodated by being allowed to work from home or part-time. Allied then contends that the jury's verdict for Norris on the ADA claim must have been based on a belief that Allied should have accommodated Norris by giving her an indefinite leave of absence, which, argues Allied, cannot be a "reasonable accommodation" under the ADA as a matter of law. Third, Allied argues that statements by Norris in applications for dis-

ability benefits preclude a reasonable jury from finding that Norris was able to perform the essential functions of her position.

We deny Allied's motion. With respect to Allied's first argument, we conclude that Norris presented sufficient evidence to permit a reasonable jury to find in her favor on each of the essential elements of her claim that she was terminated in violation of the ADA.

With respect to Allied's second argument, we conclude that the jury's answer to the special interrogatory relied upon by Allied does not represent a factual determination that Norris did not ask Allied about working from home or part-time. Since the jury could have decided that Allied should have accommodated Norris by permitting her to work from home, Allied's argument that indefinite leave cannot be a reasonable accommodation does not help Allied in this case, though the argument does have support in the case law.

In addressing Allied's third argument (that Norris's statements on disability benefits applications require judgment in favor of Allied), we reexamine an earlier ruling by us that the doctrine of judicial estoppel does not apply to statements in disability applications. While we conclude that judicial estoppel can be applicable in cases such as this one, we hold that Norris should not be judicially estopped by statements on her disability applications from taking the position that she would have been able to perform the essential functions of her position with reasonable accommodation for purposes of the ADA. We further conclude that a reasonable jury could have found that Norris was able to perform the essential functions of her position despite her statements in the disability applications.

---

1. Norris's substantive legal claims were discrimination on the basis of sex, age, and religion; harassment on the basis of sex, age, and religion; retaliation for complaining to government authorities and Allied about illegal discrimination and harassment; violation of the Americans with Disabilities Act; intentional infliction of emotional distress; breach of contract; and fraud. Some of these claims were asserted under more than one statute. The acts by Allied which Norris alleged were discriminatory and/or retaliatory included denials of promotions, alleged transfer to a less desirable territory, alleged refusal to reinstate, and termination. The court granted Allied's motion for directed verdict on the age-based harassment, religion-based discrimination, and religion-based harassment claims.

## II. FACTS[2]

### A. *Background*

1. The defendant, Allied, distributes food and related goods. At the time she stopped working due to an injury, Norris was employed as a Non–Foods Specialist at Allied. Norris's main duties in this position were selling food-related goods (not foods themselves), mostly supply and equipment, and assisting sales representatives (called "Marketing Associates") in the sale of these goods. Norris's duties required her to drive for long periods and to periodically lift objects weighing about thirty or forty pounds. *See* Ex. 81.

### B. *Norris's Injury/Illness*

2. Norris testified that on September 6, 1994, she injured her back while attempting to assemble a table that Allied had sold to a school. About a month later, Norris fell and broke her knee in an accident that was not job-related. Surgery was performed on Norris's knee in early November of 1994.

3. Norris's physician, Dr. Alfred Tan, testified that the back injury caused Norris to have acute back pain. Tan testified that during the Fall of 1994 and/or in 1995, Norris also was suffering from chronic fatigue syndrome, irritable bowel disease, neck pain, urinary incontinence, and stress. Tan testified that Norris's back injury prevented her from driving for long periods or lifting heavy objects. He also testified that Norris's condition started to deteriorate in mid-August of 1995.

4. Norris had back surgery on April 19, 1996 (after she was terminated). The surgery had initially been scheduled for the Fall of 1995. Tan testified that the recovery time for the type of surgery Norris had was usually about six months. Tan testified that Norris's condition began to improve in July or August 1996. During trial, Norris stated that she was still suffering from back pain.

### C. *Norris's Disability Leave*

5. In September 1994, Norris left work on disability leave. As is documented in detail below, starting in September 1994, Norris sent Allied a series of doctor's notes which stated that Norris would not be able to work for a period which was generally between several weeks to two months from the date of the note. Starting in September 1994, as will also be documented in detail below, Norris filled out a number of claims forms for disability benefits.

6. Norris filled out a claim for disability benefits for the State of California on September 15, 1994. In this form, Norris responded to the question "What was the first day you were too sick to perform all the duties of your regular or customary work?" by filling in "9/12/94." Norris signed her name below a statement on the form which said, "I hereby claim benefits and certify that for the period covered by this claim I was unemployed and disabled. . . ." On a doctor's certificate attached to the form, Dr. Tan answered "yes" to a question that asked whether Norris had "been incapable of performing his or her regular work." Dr. Tan stated that the approximate date that Norris would be able "to resume regular or customary work" was October 28, 1994. Ex. 862.

7. On September 16, 1994, Norris sent a memo to Hank Ontiveros, Allied's Director of Human Resources, stating that her doctors would recommended that she take a disability leave as soon as possible. Ex. 233. On September 16, 1994, one of Norris's doctors filled out a "Back to Work" form stating that Norris would be "off medically until October 28, 1994." Ex. 864.

8. On September 27, 1994, Norris filled out a state disability form similar to the one she filled out on September 15, 1994. Dr. Tan filled out a doctor's certificate similar to the one attached to the form filled out on September 15, 1994, and he again stated that the approximate date that Norris would be

---

**2.** In this section, we set out the contents of the relevant testimony and exhibits at trial without attempting to characterize the evidence in a light favorable to either party. We determine what the evidence shows if viewed in the light most favorable to the plaintiff in later sections, while addressing Allied's arguments.

A few facts are not set forth in this section but are set forth in later sections where relevant to one of Allied's arguments.

able "to resume regular or customary work" was October 28, 1994. Ex. 865.

9. On October 25, 1994, one of Norris's doctors at the Tri–Valley Orthopedic and Sports Medical Group ("Tri–Valley")[3] filled out a form which stated "work status . . . off duty: to be determined on 11–1–94." Ex. 874. On December 1, 1994, a doctor at Tri–Valley filled out a form for Norris, stating "no work status approx 1–1–95." Ex. 876. A form from Tri–Valley entitled "Return to Work Order," dated January 1, 1995, states that Norris would have "no duty until re exam 2–1–95[;] possible return to work end of Feb." Ex. 880. A Tri–Valley "Return to Work Order," dated February 23, 1995, states that Norris would have "no duty until after re exam 3–22–95." Ex. 884.

10. On March 2, 1995, Norris filled out a claim form for long-term disability (LTD) benefits from the Principal Mutual Life Insurance Company ("Principal"). Principal was an insurer that provided disability coverage for Allied employees. On the form, in response to the question "When did you become wholly unable to work?," Norris answered "9–94." In response to the question "Have you been continuously disabled since you became unable to work?," Norris checked the box marked "yes." Responding to the question "When do you feel you will be able to resume work?," Norris stated "not known." Ex. 887.

11. When questioned about this form at trial, Norris testified, "I don't know if during that whole time I was wholly unable to do any kind of work. . . . 'Wholly' was on the form. I took off on disability [in September 1994]. I answered [the form] to the best of my ability." Tan testified that he interpreted the language "wholly unable to work" on the form as meaning only that Norris had been wholly unable to work in her occupation as a Specialist.

12. On March 8, 1995, Dr. Tan filled out an "Attending Physician's Statement" attached to the form Norris filled out on March 2, 1995. In response to the question "Is patient now totally disabled [from the 'patient's job']?," Tan marked the "yes" box. In response to the question "Is patient now totally disabled [from 'any other work']?," Tan marked the "yes" box. In response to the question "Do you expect a fundamental or marked change in the future [with respect to the 'patient's job']?," Tan marked the "no" box. In response to the question "Do you expect a fundamental or marked change in the future [with respect to 'any other work']?," Tan marked the "yes" box. Answering the question "When will/or did patient recover sufficiently to perform duties [with respect to 'any other work']?," Tan marked a box that stated "3–6 mo[nths]." Tan then answered the question "Would job modification enable patient to work with impairment?" by marking the "no" box. Tan answered the question "Can present job be modified to allow for handling with impairment?" by marking the "no" box. Ex. 887.

13. A letter from Principal to Norris, dated April 4, 1995, stated that Principal would "review [Norris's] claim for consideration under the Total Disability Section of [her] group life policy." The letter added, "If we determine that you are totally disabled, you would be eligible for this benefit effective June 28, 1995. We will notify you once a decision is made on this claim." Ex. 896.

14. In letters dated March 29, 1995, and April 5, 1995, Ontiveros requested that Norris see a doctor picked by Allied so that Allied could verify Norris's medical condition. Ex. 280, 281. Norris testified that she saw the doctor, Dr. Khalid Baig.

15. On April 20, 1995, Steve Noon, Allied's Director of Marketing, sent a letter to Norris which stated, "This letter is in anticipation of your return to work this coming Monday, April 24, 1995, in your new position as Sysco Brand Manager—Non–Foods—West." The letter further stated, "I'd like you to report to my office at 9:00 a.m. on Monday morning, April 24, 1995." Ex. 282.

16. On April 21, 1995, one of Norris's doctor's offices informed Allied telephonically that Norris had not been released to return to work yet. On April 22, 1995, Norris wrote a letter to Ontiveros explaining that she had

---

**3.** Dr. Tan was Norris's primary care physician. Tri–Valley treated Norris's back, neck, and knee problems. Norris's two main doctors at Tri–Valley were Dr. Grant and Dr. Malstrom.

not been released to work yet. Ex. 283. On April 23, 1995, Norris wrote a letter to Noon stating that her doctors had not yet released her from her disability leave, and that she had an appointment scheduled for May 3, 1995, to determine her return to work status. In the letter, Norris also stated that she was "excited about resuming [her] career at Sysco" and that she was "looking forward to [her] return to Allied–Sysco." Ex. 284. A "Return to Work Order," dated April 21, 1995, from Tri–Valley, states that Norris would have "no duty until approx 5/3/95[;] no work status 10/25/94–5/3/95." Ex. 902.

17. Norris testified that Allied sent job descriptions of both the Brand Manager and the Non–Foods Specialist positions to her doctors at Tri–Valley, Dr. Grant and Dr. Malstrom, in April of 1995. *See* Ex. 277. Norris testified that Dr. Grant obtained the job descriptions in order to determine exactly what Norris's position was to aid his assessment of whether and under what circumstances Norris could be permitted to return to work. Norris testified that Dr. Grant sent a form to Principal stating that Norris could return to work with limited driving and limited duties.[4]

18. On May 3, 1995, a doctor at Tri–Valley filled out a "Return to Work Order" that stated that Norris would have "no duty until re exam [with] Dr. Grant 5–12–95." Ex. 909. On May 5, 1995, Dr. Tan filled out a "Certificate to Return to School or Work" which stated that Norris would be able to return to work on July 31, 1995. Ex. 910. On May 12, 1995, a doctor at Tri–Valley filled out a "Return to Work Order" that stated that Norris would have "no duty until further notice—pending MRI ..." Ex. 912. A "Return to Work Order," dated May 19, 1995, from Tri–Valley, stated that Norris would have "no duty until one month[;] awaiting neurology consult." Ex. 914.

19. Norris sent Allied a "Certificate to Return to School or Work," signed by Dr. Tan on June 7, 1995, which stated that she would be able to return to work on July 10, 1995. Above this certificate, Norris wrote a note to Deborah Barbe, Allied's Benefits and Workers Compensation Supervisor, stating, "I have not heard from Principal Mutual on the LTD yet, have you?" Ex. 916. On June 8, 1995, Norris sent Barbe a memo stating that she was attaching a return to work certificate and that she was "looking forward to a full recovery and resuming [her] career." Ex. 917. On June 21, 1995, Norris sent a memo to Barbe which asked for "an update on [her] medical leave status and long term disability insurance status." Ex. 918. A "Return to Work Order" from Tri–Valley, faxed by Norris to Allied and dated June 19, 1995, states that Norris would have "no duty until 4 weeks." Ex. 922.

20. On July 10, 1995, Dr. Tan wrote a report about Norris that was sent to Principal. The report describes Norris's medical problems and concludes with the following two paragraphs:

> At her current degree of illness with associated symptoms, [Norris] cannot sit or stand longer than one hour at a time. I recommend that she does not drive more than 45 minutes at a time. She should not lift more than 10 lbs. occasionally; and she should refrain from bending. She should not perform repetitive upper extremity movements. She should not lift or reach above her shoulders. For this reason, Mrs. Norris is unable to perform her duties at her own occupation.
>
> At this time, her prognosis is guarded. I anticipate her condition to be stable for the next 2–3 months. If you have any questions, please don't hesitate to contact me.

Ex. 923. At trial, Tan testified that it was his opinion in July of 1995 that Norris was unable to perform her duties at her occupation, as her duties required driving and lifting.[5]

21. On July 13, 1995, Dr. Tan sent Allied a "Certificate to return to work" stating that

---

**4.** Such a form was never introduced into evidence. Defendant objected to Norris's testimony about the form on best evidence grounds. The court did not rule on this objection, but stated that if one of the parties had a copy of the purported form, the form should be presented to the court. However, there was never any follow-up by the parties.

**5.** Tan testified that Norris told him that her job required lifting and long periods of driving.

Norris "will be able to return to work on 8/28/95." Ex. 924. On August 18, 1995, Dr. Tan filled out a "Certificate to Return to School or Work" that stated, "Brenda Norris is my patient and has been under my care from 8/1/95 to 10/31/95 and is able to return to work/school on _____ [blank not filled in]." Ex. 926.

22. Barbe testified that since the beginning of Norris's disability leave, other than during a brief period in April 1995, Allied always had at least one active (unexpired) medical excuse slip from Norris stating that she was not released to return to work. However, no documentary evidence was introduced at trial showing that Allied was provided with a medical excuse that was effective for the period between October 31, 1995, and November 30, 1995 (the date Norris was terminated).

23. Most of the "return to work" forms filled out by Norris's doctors had boxes or blanks which stated "light work," "light duty," or "restrictions." In no case were the "light work" or "light duty" boxes or blanks checked or filled in, and in no case did one of Norris's doctors indicate on the "return to work" forms that Norris had any specific "restrictions." Dr. Tan testified that the "return to work" forms he filled out only meant that Norris could not perform her regular occupation.

**D. Evidence Relating to Whether Norris Requested Accommodation**

24. Norris testified that she told Barbe orally that she would like to return to work with accommodations. Norris testified that she asked Barbe whether she could work at home or part-time. Norris testified that these requests were made around April of 1995. In response to a question by defense counsel about why Norris had not asked in writing about the possibility of working from home, Norris answered that she had asked

Barbe orally many times. Norris also testified that Dr. Grant told her that she could return to work with limited driving and limited duties.

25. Norris testified that in response to her inquiries about working from home or part-time, Barbe either told her that she would get back to her or that Norris should talk to Ontiveros about the matter. Norris testified that Allied never responded to her inquiries about working at home or part-time. Norris also testified that Barbe and Ontiveros told her between May and July of 1995 that she had to be fully recovered to be permitted to return to work.

26. Barbe testified that she talked to Norris several times per month or per week during Norris's disability. Barbe testified that Norris never asked her about working at home or part-time. Barbe testified that Norris never discussed with her in any way working from home or part-time or returning to work with light duty. Barbe testified that Norris never requested reasonable accommodation or indicated a need for accommodation. Barbe testified that Norris never indicated that she was ready to return to work. Barbe also testified, however, that Norris expressed a desire to return to work when she could. Frank Damante, Allied's President, testified that he was not aware of any request by Norris to return to work or to be accommodated.

27. Norris also contended at trial that certain written inquiries she made to Allied constituted or reflected requests for accommodation. Norris inquired, in a letter to Ontiveros dated April 24, 1995, "Would you please provide me with information on any programs designed to facilitate employees returning to work from an injury or serious illness?" Ex. 904.[6]

28. Ontiveros responded, in a letter dated May 1, 1995, as follows:

> illness? I have expressed my desire of returning to work to my physicians and they have asked about the type of duties I perform and how strenuous they are.
>
> Ex. 283. Barbe testified that the letters dated April 22 were never received by Allied and that only the letter dated April 24 was received.

---

6. Norris also testified that she sent Allied two letters, dated April 22, 1995, which had many similarities to and some differences from the letter dated April 24, 1995. One of the letters dated April 22, 1995, stated:

> Would you please provide me with information on any programs designed to facilitate employees returning to work from an injury or serious

I am unsure to what you are referring in your request for information on programs designed to facilitate employees returning to work from an injury or serious illness. Allied–Sysco does not have any programs designed specifically for that purpose. If you are interested in information regarding a rehabilitation program for your knee, we suggest you make appropriate inquiries with your physician, who should be in a position to provide some guidance.

Ex. 289.

29. In a memorandum to Barbe dated June 21, 1995, Norris wrote:

I would also appreciate an update on my medical leave status and long term disability insurance status. As I have discussed with you previously, my financial situation is adding further to my distress. If there are any options that Allied Sysco/Sysco offers employees on disability, please advise me as soon as possible.

Ex. 918.

30. Barbe responded, in a letter dated June 30, 1995,

All options available to employees of Allied Sysco who are on disability have been extended to you. This includes the coordination of all available sick and vacation time with state disability, and the application for Long Term Disability coverage after an individual has met the six (6) month waiting period.

Ex. 303.

31. Norris contended that the inquires in her letters of April 24, 1995, and June 21, 1995 (about "programs designed to facilitate employees returning to work from an injury or serious illness" and "options that Allied Sysco/Sysco offers employees on disability"), were inquiries about returning to work with accommodation. Barbe testified that Allied understood the inquiry about "programs designed to facilitate employees returning to work from an injury or serious illness" as an

inquiry about rehabilitation programs. Barbe testified that she did not understand the inquiry about "options that Allied Sysco/Sysco offers employees on disability" to be an inquiry about returning to work with accommodation but understood the inquiry to be related to Norris's concerns about her financial situation.

32. While Allied disputes Norris's claim that she requested accommodation, it is undisputed that Allied did not make any efforts to accommodate Norris. Damante testified that no efforts were made to accommodate Norris and that Allied did not make any inquiries in their communications with Norris about accommodation. Barbe testified that Allied never engaged in any kind of interactive process with Norris to determine whether some sort of accommodation could permit Norris to return to work.

**E.** *Norris's Termination*

33. On November 30, 1995, Allied terminated Norris, effective December 1, 1995. Allied notified Norris about the termination and explained the termination in a letter, which stated, in relevant part,

As you know, your Family and Medical Leave Act leave ended several months ago. Due to your continuing unavailability for work, despite the expiration of your leave and the exhaustion of all vacation and sick time, the Company has determined that it will no longer hold your position open. Thus, your employment with Allied–Sysco Food Services, Inc., is terminated effective December 1, 1995.

Ex. 316.

**F.** *Norris's Receipt of Disability Benefits*

34. Barbe testified that Norris received disability benefits either from the Employment Development Department of the State of California or from Principal from the date her leave began in September 1994.[7] Barbe

---

7. On November 9, 1994, February 1, 1995, March 5, 1995, May 5, 1995, and August 4, 1995, Norris submitted disability claim forms to the State of California upon which she signed a certification printed on the forms that stated "I certify that I continued to be disabled and incapable of doing my regular work...." On the

form dated August 4, 1995, Norris wrote, "Note: I have an insurance policy for long term coverage, but they are refusing to pay at this point."

These five forms were not introduced as exhibits at trial. However, the five forms were attached as exhibits to a pre-trial motion filed by Allied. For this reason, as will be explained

testified that she believed that Norris received short-term disability benefits from the State for the first six months of her leave, that she received both short-term disability from the State and long-term disability payments from Principal for some time period after the first six months, and that she received only long-term disability payments from Principal after her state disability ran out. Barbe testified that state disability benefits normally run out after twelve months.

35. On February 14, 1996, Principal sent a letter to Norris. The letter stated, "I am pleased to tell you that we are approving your claim under the Total Disability Section of your Group Life Policy." The letter continued, "This letter will provide you with important information about your benefits." In a section entitled "Benefit Information," the letter stated "As long as you remain unable to work at any occupation, your life insurance in the amount of $111,000.00 will continue without further premium payment." Ex. 929. No documentary evidence was introduced showing that Norris received any long-term disability benefits from Principal prior to February 1996.

36. Norris testified that she was still receiving long-term disability benefits from Principal at the time of trial. When asked at trial about whether she was receiving "total disability" benefits, Norris answered, "I don't quite know how to answer this ... it [the letter from Principal] says 'total disability,' and I don't think I'm totally—I don't know that that's been determined yet."

## G. Evidence Relating to Essential Functions of Norris's Position

37. On December 21, 1994, Allied offered Norris the position of "Sysco Brand Manager—West." Ex. 247. Norris and Damante

each testified that Norris accepted this position.

38. Three persons who held positions of Brand Manager at Allied testified about the duties of a Brand Manager. Steve Noon, a former Brand Manager, testified that the purpose of a Brand Manager was to promote Sysco brand products.[8] Noon testified that the Brand Manager position was an entry-level "administrative marketing position." Noon testified that the position was an administrative position which involved selling through other people—the job of the Brand Manager was not to sell but to get other people to sell. Noon testified that a Brand Manager was, by the definition of the job, supposed to be in the office. Noon testified that the position had many administrative and clerical duties—record-keeping, communicating with the corporate office in Houston, communicating with merchandisers.

39. Jerry Carr, another former Brand Manager, also testified at trial. Carr testified that most of the Brand Manager job was paperwork. Carr testified that 60 percent of the job was sitting behind a desk, going over reports, analyzing performance of particular salespersons, and making future plans for particular salespersons. Carr testified that a typical day as Brand Manager consisted of getting in early in the morning, talking to people in Houston and on the East Coast on the phone for a couple hours, and then doing paperwork until early afternoon. Carr testified that when he was a Brand Manager, if he got lucky, he would get to go out in the field and sell to customers near the end of the day.

40. Mark Castleman, a Brand Manager at Allied, testified that the job involved extensive paperwork. The Brand Manager had

---

below, we will consider these five forms in determining whether Norris should be judicially estopped from claiming that she was able to perform the essential functions of her position for purposes of the ADA.

The five forms were applications for State Disability Insurance (SDI). According to Allied's employee handbook, "[t]he California Unemployment Insurance Act provides disability insurance benefits to eligible employees who cannot work because of sickness or injury at the job." To be

eligible for these SDI benefits, according to Allied's employee handbook, an employee must:
- [B]e unable to work because of pregnancy or a nonoccupational illness or injury[;]
- Have been disabled for seven (7) consecutive days or [be] hospitalized, whichever comes first [; and]
- [Be] certified disabled and under a doctor's care.

Ex. 350, p. 16.

8. Sysco is the corporate parent of Allied.

to keep up with corporate reports, keep up with items that would soon be available for selling, and do market evaluations on product lines. Norris testified that Noon told her that the Brand Manager position required much more time to be spent in the office than did the Non–Foods Specialist position. Norris testified that Castleman had told her that the Brand Manager position was that of a glorified clerk.

41. A written description of the Brand Manager position, dated March 13, 1995, and prepared by Noon appears to contradict the testimony of Noon, Carr, and Castleman in some respects.[9] According to the description, the Brand Manager's time is allocated as follows: 60 percent for selling with Marketing Associates ("MA's"—general salespeople), 10 percent for direct selling to accounts, 10 percent for district meetings (teaching and promotions), 5 percent for reviewing reports and paperwork, and 15 percent for other duties. The description states that the "position will have 3 full days selling with MA's, ¾ day direct selling, ½ day for District Meetings and ¾ day for Admin. work." The description states that one of the requirements for the position is an "[a]bility to drive in an auto for long periods of time (7–10 hours a day/4 times a [week])." Ex. 277.

42. A job description of Norris's previous position of Non–Food Specialist, dated April 28, 1995, states that the "position will require 2 full days selling with MA's, 1 full day direct selling, ½ day for District Meetings, and 1½ days for dispenser installation or administrative duties." Ex. 277.

**H. *Evidence Relating to Norris's Ability to Perform her Position***

43. Dr. Tan testified that Norris could have worked from home in 1995. Tan testified that the required accommodation would have been no heavy lifting, no long periods of driving, using something to support Norris's back while at home, and taking other measures such as frequent walks to control her back pain. Tan testified that there were short time periods in 1995 when Norris

would not have been able to work at home at all because several of her medical problems flared up at the same time.

44. Norris testified that she could have worked at home on the computer and the telephone during her disability. Norris testified that what she could not do was lift heavy sample cases or drive long periods of time.

45. Norris testified that she has not looked for work since being terminated. When defense counsel asked Norris, "So the fact is you haven't looked for any work because you continue to be disabled, is that right?," Norris answered "correct."

**I. *Allied's Return to Work Policy***

46. Norris introduced into evidence a document, dated November 24, 1993, entitled "Return to Work Policy." The document states, "a 'fit for duty' medical evaluation will be required *prior* to an injured employee returning to work.... You must have an *unrestricted* return to work release from our contract clinic [specialists in industrial medicine], who have thorough knowledge of our job descriptions." Ex. 161 (second emphasis added).

47. Allied's employee handbook had a section entitled "Medical Leave (Occupational Disabilities)," which stated:

> A leave of absence shall be granted upon written request to any full-time or part-time employee who sustains a work-related disability. A leave of absence for a work-related disability shall be extended to the employee for the duration of the work-related disability.
>
> Before returning to work following a leave of absence for a work-related disability, an employee must submit a physician's verification stating the employee's ability to return to work and the date that he/she is able to return.
>
> . . . .
>
> The Company will retain employees on an extended leave of absence for work-related disabilities until one of the following situations takes place:

---

9. The title on the position description is "Non–Food Sysco Brand Specialist." The Brand Manager position was sometimes called a Brand Spe-cialist at Allied. There was testimony that there was no difference between a Brand Specialist and a Brand Manager.

- The employee is released to work *without restriction.*

- The Company receives medical evidence satisfactory to it that the employee will be unable to return to work.

- The employee resigns or actually or constructively informs the Company that he/she does not intend to return to the Company's employ.

Ex. 350, pp. 14–15 (emphasis added).

48. Damante testified that the "Return to Work Policy" (Ex. 161) is still in existence. Damante testified that an employee must be able to return in their full capacity, without qualifications, before being allowed to return to work. Damante testified that if a job normally required an employee to lift thirty or forty pounds and the person could not do so, the policy prohibited the person from returning to that job.

49. Barbe testified that Allied would permit an employee to return to work even if he or she had certain restrictions if the employee's doctor permitted the employee to return to work. Barbe testified that she understood Allied's policy on returning to work as only requiring a clearance from Allied's contract clinic before an employee could be permitted to return to work, and that the clearance could have certain restrictions. Barbe admitted that her understanding of Allied's policy about returning to work contradicted the written "Return to Work Policy."

50. Norris testified that she received the "Return to Work Policy." Norris testified that Barbe and Ontiveros told her between May and July of 1995 that she had to be fully recovered to return to work. Norris testified that she told Dr. Grant that she would not be permitted to return on a limited basis but would only be permitted to return full-time.

51. Several current or former Allied employees testified that Allied had permitted employees who had been ill or injured to work from home and/or part-time. There was also testimony that Allied had allowed employees who had suffered serious illness or injury to remain on disability leave for more than one year. In addition, Allied once arranged for an employee who could not drive due to an illness to be driven around by a Marketing Associate while providing training to the Marketing Associate. Norris testified that she was aware that other employees had been allowed to work from home and/or part-time.

## III. DID NORRIS INTRODUCE SUFFICIENT EVIDENCE TO PERMIT A REASONABLE JURY TO CONCLUDE THAT SHE ESTABLISHED THE ESSENTIAL ELEMENTS OF HER ADA CLAIM?

### A. *The Americans with Disabilities Act*

Allied contends that Norris did not present sufficient evidence to permit a reasonable jury to find that Allied terminated Norris in violation of the Americans with Disabilities Act (ADA). The ADA generally prohibits employers from discriminating against qualified individuals with disabilities because of their disabilities. *See* 42 U.S.C.A. § 12112(a) (1995).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; ... a record of such an impairment; or ... being regarded as having such an impairment." 42 U.S.C.A. § 12102(2). The ADA defines "qualified individual with a disability" as "an individual who ... can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). The individual must be able to perform the essential functions of the position either with a reasonable accommodation, if such an accommodation is necessary for the person to be able to perform the essential functions, or without reasonable accommodation, if accommodation is not necessary for the person to be able to perform the essential functions. *See* 42 U.S.C.A. 12111(8). The term "reasonable accommodation" includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii) (1996).

Under the ADA, "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C.A. § 12112(b)(5)(A). "Undue hardship" means "an action requiring significant difficulty or expense...." 42 U.S.C.A. § 12111(10). "Discrimination" under the ADA also includes "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C.A. § 12112(b)(5)(B).

**B.** *Did Norris Present Sufficient Evidence to Enable a Reasonable Jury to Conclude that she Requested that Allied Reasonably Accommodate her?*

■ Allied argues that Norris did not present sufficient evidence to permit a reasonable jury to conclude that Norris requested reasonable accommodation from Allied. We disagree.

Norris testified at trial that she told Deborah Barbe, an employee in Allied's human resources department, that she would like to return to work with accommodations. Norris testified that she orally asked Barbe about working from home or part-time. *See* Facts ¶ 24. Norris also wrote two memos to Allied that a reasonable jury could have construed to be written follow-ups to oral requests for accommodation. *See* Facts ¶¶ 27–31.

Barbe contradicted Norris's testimony and denied that Norris ever requested reasonable accommodation or talked about working from home or part-time. *See* Facts ¶ 26. However, it is up to the jury to evaluate the credibility of witnesses. A reasonable jury could have believed Norris's testimony and disbelieved Barbe's testimony. Thus, a reasonable jury could have found that Norris requested that Allied reasonably accommodate her by permitting her to work from home or part-time.

**C.** *Did Norris Present Sufficient Evidence to Enable a Reasonable Jury to Conclude that she Could Have Performed the Essential Functions of her Position with Reasonable Accommodation?*

Allied contends that Norris did not present sufficient evidence to permit a reasonable jury to find that Norris could have performed the essential functions of her position with any reasonable accommodation. We are not persuaded by this argument.

**1.** *Norris's Position.*

■ The appropriate position at Allied to consider in evaluating this argument is not the position of Non–Foods Specialist that Norris held when she went out on disability, but the position of Brand Manager that Norris was offered in December 1994. Both Norris and Frank Damante, Allied's president, testified that Norris accepted this position. *See* Facts ¶ 37. Thus, the evidence supports a rational inference that the position to which Norris would have returned at the time she requested reasonable accommodation (according to her testimony) was "Brand Manager."

**2.** *Essential Functions of Norris's Position.*

■ What were the essential functions of the Brands Manager position? For purposes of the ADA, "[t]he term *essential functions* means the fundamental job duties of the employment position the individual holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

According to the interpretations of the ADA by the Equal Employment Opportunity Commission (EEOC), "[t]he inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. § 1630, App. at p. 342 (1996). "If the individual who holds

the position is actually required to perform the function the employer asserts is an essential function, the inquiry will then center around whether removing the function would fundamentally alter that position." 29 C.F.R. § 1630, App. at p. 343. "[W]ritten job descriptions ... as well as the employer's judgment as to what functions are essential are among the relevant evidence to be considered in determining whether a particular function is essential." 29 C.F.R. § 1630, App. at p. 343. "The work experience of past employees in the job or of current employees in similar jobs is likewise relevant to the determination of whether a particular function is essential." 29 C.F.R. § 1630, App. at p. 343.

An employer may reasonably accommodate an employee "by reallocating or redistributing non-essential, marginal job functions." 29 C.F.R. § 1630, App. at p. 344. However, "[a]n employee or other covered entity is not required to reallocate essential functions." 29 C.F.R. § 1630, App. at p. 344.

In this case, there was considerable testimony about what the essential functions of the Brand Manager position were from three Allied employees who at one time held the position. These employees testified that the Brand Manager position was mainly an administrative job. Based on this testimony, a reasonable jury could have concluded that the essential functions of the position were administrative and clerical tasks such as doing paperwork, working on the computer, and talking on the telephone. From the testimony of these three employees, a reasonable jury also could have concluded that the employees who actually held the Brand Manager position did not devote significant time to selling in the field and that selling in the field was therefore not an essential function of the Brand Manager position. *See* Facts ¶¶ 38–40.

A written description of the Brand Manager position that was introduced into evidence contradicted the testimony of the three Allied employees. According to this written description, a majority of a Brand Manager's time was devoted to direct selling, and only a small portion of the Brand Manager's work consisted of administrative duties. The allocation of duties in this description did not seem to differ significantly from the allocation of duties in a written description of Norris's former position of Non–Foods Specialist. *See* Facts ¶¶ 41–42.

However, the jury reasonably could have believed that the testimony of persons who actually held the Brand Manager position was more accurate evidence of what the essential functions of the Brand Manager position were than the written description of the Brand Manager position. Thus, the jury reasonably could have concluded, despite the written description, that the essential functions of the Brand Manager position were administrative and that direct selling in the field was not an essential function of the Brand Manager position.[10]

### 3. *Reasonable Accommodations that Could Have Enabled Norris to Perform the Essential Functions of her Position.*

 The jury reasonably could have concluded from the evidence that the main way in which Norris's medical problems limited her ability to do her job was that her back injury prevented her from driving for long periods of time and lifting heavy objects. The jury also could have concluded, reasonably, that Norris's array of medical problems—back pain, chronic fatigue syndrome, neck pain, irritable bowel disease, urinary incontinence, and stress—would have made it difficult for her to put in full days of work or to adhere strictly to a regular work schedule. *See* Facts ¶¶ 3, 43.

 Based on testimony by Norris and her physician, Dr. Tan, a jury could have reasonably found that Norris could have been reasonably accommodated by being permitted to work from home (part-time, if nec-

---

10. It would not be surprising if the jury did not pay much attention to the written description of the Brand Manager position, since neither party argued to the jury that the written description was evidence of what the essential functions of the Brand Manager position were. The written description of the Brand Manager position was introduced as an exhibit by the plaintiff, for purposes other than showing what the essential functions of the position were.

essary), where she could have performed the administrative duties of the Brand Manager job on the computer and over the telephone. *See* Facts ¶¶ 43, 44. Under the ADA, reasonable accommodation may include "job restructuring, part-time, or modified work schedules." 42 U.S.C.A. § 12111(9)(B); *see also Pattison v. Meijer, Inc.,* 897 F.Supp. 1002, 1007–08 (W.D.Mich.1995). Allowing an employee to work at home may also be a reasonable accommodation. *See Langon v. Department of Health & Human Services,* 959 F.2d 1053, 1060–61 (D.C.Cir.1992).

In addition, an employer may reasonably accommodate an employee "by reallocating or redistributing non-essential, marginal job functions." 29 C.F.R. § 1630, App. at p. 344. The EEOC's interpretations of the ADA explain:

> For example, an employer may have two jobs, each of which entails the performance of a number of marginal functions. The employer hires a qualified individual with a disability who is able to perform some of the marginal functions of each job but not all of the marginal functions of either job. As an accommodation, the employer may redistribute the marginal functions so that all of the marginal functions that the qualified individual with a disability can perform are made a part of the position to be filled by the qualified individual with a disability. The remaining marginal functions that the individual with a disability cannot perform would then be transferred to the other position.

29 C.F.R. § 1630, App. at p. 344. In this case, the jury could have inferred from the evidence that the marginal functions of the Brand Manager job that Norris could not have performed, such as direct selling in the field, could have been redistributed to Mark Castleman, the other Non–Foods Brand Manager at the time of Norris's disability. Conversely, marginal functions of the Brand Manager position that Norris could have performed could have been redistributed from Castleman to Norris.

Even if the jury believed that direct selling in the field was an essential function of Nor-

ris's position, there was evidence from which a jury reasonably could have concluded that Allied could have accommodated Norris. Allied once arranged for an employee who could not drive due to an illness to be driven around by a Marketing Associate while providing training to the Marketing Associate. *See* Facts ¶ 51. The jury reasonably could have determined that Allied could have allowed Norris to do direct selling in the field together with a Marketing Associate who would have done most of the driving and lifting while Norris provided training to the Marketing Associate. According to the EEOC's interpretations, "[p]roviding personal assistants, such as a page turner for an employee with no hands or a travel attendant to act as a sighted guide to assist a blind employee on occasional business trips, may also be a reasonable accommodation." 29 C.F.R. § 1630, App. at p. 344.

**D. *Did Norris Present Sufficient Evidence to Enable a Reasonable Jury to Conclude that she had a "Disability" as Defined for Purposes of the ADA?***

■ Allied argues that Norris was not a qualified individual with a "disability" as that concept is defined for purposes of the ADA. The ADA defines "disability" as "a *physical or mental impairment* that *substantially limits* one or more of the *major life activities* of [an] individual." 29 C.F.R. § 1630.2(g)(1) (emphasis added).[11] A "physical impairment" is "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1).

Under the EEOC's interpretations of the ADA,

> "Major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include car-

---

**11.** "Disability" also includes "a record of such [a physical or mental] impairment" or "being re-

garded as having such an impairment." 29 C.F.R. §§ 1630.2(g)(2)–(3).

ing for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working.* This list is not exhaustive. For example, other major life activities include, but are not limited to, sitting, standing, *lifting, reaching.* 29 C.F.R. § 1630, App. at p. 339 (emphasis added).

The term "substantially limits" means either "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i)–(ii).

With respect to the major life activity of working, "the term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). *See also Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995); *Dutton v. Johnson County Bd. of County Com'rs,* 859 F.Supp. 498, 505 (D.Kan. 1994). The EEOC's interpretations go on to state:

> For example, an individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs ... even if the

individual were able to perform jobs in another class.

29 C.F.R. § 1630, App. at p. 340.

"[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R. § 1630, App. at p. 339.[12] For instance, in *Sanders v. Arneson Products, Inc.,* 91 F.3d 1351, 1353–54 (9th Cir.1996), the Ninth Circuit Court of Appeals held that a psychological disorder triggered by cancer, lasting less than four months, and having no residual effects was not a "disability" under the ADA. Similarly, in *Rakestraw v. Carpenter Co.,* 898 F.Supp. 386 (N.D.Miss.1995), the court concluded that a back injury which was completely cured by back surgery within one year and ten months of the injury's occurrence was not a "disability" for purposes of the ADA. *See also Blanton v. Winston Printing Co.,* 868 F.Supp. 804, 807 (M.D.N.C.1994) (knee injury which flared up for several months but which afterward only impaired ability to run well or climb stairs easily and which could have been ameliorated by surgery was not "disability" under ADA).

In this case, the jury easily could have concluded from the evidence that Norris had a back injury which substantially limited her ability to perform the major life activity of lifting.[13] The jury also could have concluded that Norris's back injury substantially limited her ability to perform a broad class of jobs requiring lifting or other manual labor. Furthermore, a reasonable jury could have concluded that Norris's other medical problems—chronic fatigue syndrome, irritable bowel disease, urinary incontinence, and neck pain—were, in combination, sufficiently dis-

**12.** Under the EEOC's interpretations,

The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

*29 C.F.R. § 1630.2(j)(2).*

**13.** The jury also could have concluded that Norris's back injury substantially limited her ability to drive, and the jury could have reasonably felt that, at least in California, driving is a major life activity.

abling to substantially limit Norris's ability to hold down a full-time job. *See* Facts ¶ 3.

Allied's main argument in support of its contention that Norris did not have a "disability" as defined for purposes of the ADA was that her back injury was a temporary injury, as in *Rakestraw,* 898 F.Supp. 386. But this case is distinguishable from *Rakestraw,* for the plaintiff's back injury in *Rakestraw* was completely cured within one year and ten months of the injury. *See* 898 F.Supp. at 389. By contrast, during trial, more than two years after she suffered her back injury, Norris stated that she was still suffering from back pain as a result of the injury. A reasonable jury could have concluded that, despite undergoing surgery, Norris had not fully recovered from the back injury and that it was uncertain whether she would ever fully recover. *See* Facts ¶ 4. In addition, the jury could have reasonably concluded that some of Norris's other medical problems, such as chronic fatigue syndrome, were chronic problems that would substantially limit Norris's ability to engage in the major life activity of working even if Norris's back injury were to completely heal. For these reasons, the jury could have reasonably concluded that Norris had a "disability" for purposes of the ADA.

**E.** *Did Norris Present Sufficient Evidence to Enable a Reasonable Jury to Conclude that Norris's Disability was a Motivating Factor in Allied's Decision to Terminate Her?*

■ Allied argues that Norris did not present sufficient evidence to permit a reasonable jury to conclude that Norris's disability was a motivating factor in Allied's decision to terminate her. This argument was not raised in Allied's opening motion papers, but was first raised only in Allied's reply brief. Therefore, we may consider it to be procedurally barred. However, because it is not difficult to explain why the argument lacks substantive merit, we will proceed to discuss the argument.

Allied stated in writing that the reason it terminated Norris was "[d]ue to [her] continuing unavailability for work." *See* Facts ¶ 33. A reasonable jury could have concluded that Norris was unavailable for work because of her disability and a refusal by Allied to accommodate it. The jury could have reasonably concluded that, knowing that Norris's disability was the reason she had not returned to work, Allied chose to terminate Norris instead of accommodating the disability—meaning that Norris's disability was a motivating factor in Allied's decision to terminate her. The ADA clearly prohibits an employer from engaging in such conduct. *See* 42 U.S.C.A. § 12112 ("discrimination" includes "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant"); *see also Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1283 (7th Cir.1996) (if an employer should have reasonably accommodated an employee's disability and did not, the employer has discriminated against the employee). In addition, a reasonably jury could have treated Allied's "Return to Work Policy," which stated that Allied employees had to have an *"unrestricted* return to work release" before being permitted to return to work, as evidence that Norris's disability was a motivating factor in Allied's decision to terminate her. *See* Facts ¶¶ 46–50 (emphasis added).

**IV. SIGNIFICANCE OF JURY'S ANSWER TO SPECIAL INTERROGATORY # 24**

**A.** *Did the Jury's Answer to Special Interrogatory # 24 Represent a Finding that Norris did not Request that Allied Reasonably Accommodate her by Permitting her to Work from Home or Part–Time?*

■ The court submitted forty-two special interrogatories to the jury to guide the jury in its deliberations. One of Norris's claims was that Allied discriminated against her on the basis of sex, retaliated against her, and violated the ADA by refusing to reinstate her—refusing to permit her to return to work after she began her disability leave and before she was terminated. At trial, Allied

disputed Norris's contention that she asked to return to work, with reasonable accommodation, before she was terminated. Cognizant of this dispute, the court thought that it would not have made sense, if the jury did not believe that Allied ever in fact refused to reinstate Norris, to make the jury answer separate interrogatories about (1) whether Allied discriminated against Norris on the basis of sex by refusing to reinstate her, (2) whether Allied retaliated against her by refusing to reinstate her, and (3) whether Allied violated the ADA by refusing to reinstate her.

Therefore, the court sought to fashion a threshold special interrogatory for the refusal to reinstate claim that would have asked the jury to determine whether Allied in fact refused to reinstate Norris. If the jury determined that Allied did not refuse to reinstate Norris, it would have been unnecessary for the jury to answer the three more specific interrogatories about whether the alleged refusal to reinstate was based on sex discrimination, retaliation, or a violation of the ADA.

Thus, the court posed to the jury Special Interrogatory # 24, which asked, "Did Ms. Norris prove by a preponderance of the evidence that after she began her disability leave but before she was terminated she sought to begin working again and that Allied–Sysco refused to permit her to begin working again?" The jury answered "no" to Special Interrogatory # 24.

Defendant argues that the jury's answer to Special Interrogatory # 24 represents a factual finding that Norris did not request that Allied accommodate her by permitting her to work from home or part-time. Defendant argues that such a factual finding must mean either that the jury's answer to Special Interrogatory # 24 conflicts with the jury's conclusion that Allied violated the ADA by terminating Norris or that the jury believed that Allied should have accommodated Norris by extending her leave for an indefinite period.

If Special Interrogatory # 24 had in fact asked the jury to decide what the court had intended the jury to determine through that interrogatory, we would be inclined to agree with defendant's argument. However, upon careful examination of Special Interrogatory # 24, we find that Special Interrogatory # 24 was defective, as it did not actually ask the jury to decide what the court wished the jury to decide.

In order for the jury to answer Special Interrogatory # 24 in the affirmative, the jury would have had to believe both of the following: (1) that Norris sought to begin working again after she began her disability leave but before she was terminated; and (2) that Allied refused to allow Norris to begin working again after she began her disability leave but before she was terminated. Therefore, a reasonable jury would have answered Special Interrogatory # 24 in the negative if the jury believed (1) that Norris sought to begin working again, *with reasonable accommodation*, after she began her disability leave but before she was terminated; and (2) that Allied permitted or would have permitted Norris to resume working again, after she began her disability leave but before she was terminated, but only *with no accommodation*.

In fact, we do not think that a reasonable jury could have given a "yes" answer to Special Interrogatory # 24, because it is undisputed that, on April 20, 1995, Allied sent Norris a letter asking her to report to work on April 24, 1995. *See* Facts ¶ 15. Thus, the undisputed evidence showed that, in April 1995, Allied was willing to allow Norris to return to work, though without offering her reasonable accommodation.

In other words, Special Interrogatory # 24 was defective because, instead of just asking whether Allied refused to permit Norris to return to work, it should have asked whether Allied refused to permit Norris to return to work *with reasonable accommodation*.[14] A

14. The only party harmed by the defect in Special Interrogatory # 24 was the plaintiff, because the jury could have believed that Allied violated the ADA by refusing to reinstate Norris with reasonable accommodation (or that Allied re-

fused to reinstate Norris with reasonable accommodation because of gender discrimination or retaliation) despite the jury's answer to Special Interrogatory # 24. By virtue of its negative answer to Special Interrogatory # 24, the jury

reasonable jury could have believed, despite answering "no" to Special Interrogatory # 24, that Norris requested that Allied reasonably accommodate her by permitting her to work at home or part-time. Thus there is no conflict between the jury's answer to Special Interrogatory # 24 and its conclusion, through its "yes" answer to Special Interrogatory # 34, that Allied violated the ADA by terminating Norris.[15]

### B. *Impact of Allied's Return to Work Policy*

If the Court of Appeals reviews this decision and does not agree with the analysis in the immediately preceding section, we respectfully suggest that it consider the following issue: What should be the legal impact of

was instructed to skip Special Interrogatories # 25, 26, and 28, which asked whether Allied, by refusing to reinstate Norris, discriminated against her on the basis of sex, retaliated against her, or violated the ADA. Plaintiff, however, has not claimed any error or harm relating to Special Interrogatory # 24.

**15.** Special Interrogatory # 34 stated the following:

Did Ms. Norris prove by a preponderance of the evidence that Allied–Sysco violated the Americans with Disabilities Act by terminating her? You should answer "yes" to this question only if you find that Ms. Norris proved, by a preponderance of the evidence, all of the following:
(1) that she was a qualified individual with a disability;
(2) that she would have been able to perform the essential functions of her position with reasonable accommodation;
(3) that she requested reasonable accommodation from Allied–Sysco, or that Allied–Sysco knew or reasonably should have known that she wanted to resume working with a reasonable accommodation;
(4) that Allied–Sysco could have reasonably accommodated her, without undue hardship;
(5) that Allied–Sysco did not offer her a reasonable accommodation; and
(6) that Ms. Norris's disability was a motivating factor in Allied–Sysco's decision to terminate her.

**16.** 29 C.F.R. § 1630, App. at p. 351; *see also Office of Senate Sergeant at Arms v. Office of Senate Fair Employment Practices*, 95 F.3d 1102, 1107–08 (Fed.Cir.1996); *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1286 (7th Cir.1996).

**17.** *See Fussell v. Georgia Ports Authority*, 906 F.Supp. 1561, 1570 (S.D.Ga.1995) ("the employ-

Allied's return to work policy upon Norris's burden to request reasonable accommodation?

We begin this discussion by noting that our review of the EEOC's interpretations and the applicable case law discloses the following general principles about an employee's burden to request reasonable accommodation. In general, an employee must request reasonable accommodation from an employer in order for the employer's duty to reasonably accommodate the employee to be triggered.[16] However, if an employee's disability and the need to accommodate it are obvious, an employee is not required to expressly request reasonable accommodation.[17,18]

ee must show that he requested a reasonable accommodation ... or that the adaptation constituting the suggested accommodation was reasonably apparent"); 29 C.F.R. § 1630, App. at p. 351 ("Employers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of a qualified individual with a disability that is *known* to the employer) (emphasis added).

**18.** The court therefore instructed the jury that "[a]n employee is not required to expressly state to an employer that the employee is disabled and requires accommodation if it would be clear to a reasonable employer that the employee is disabled and requires and wants accommodation." *See* Final Jury Instruction # 24. The court also instructed the jury that one of six elements which Norris had to establish in order to prevail on her claim that Allied violated the ADA by terminating her was that "(a) [Norris] requested reasonable accommodation from Allied–Sysco, or (b) Allied–Sysco knew or reasonably should have known that she wanted to resume working with a reasonable accommodation." *See* Final Jury Instruction # 26; Special Interrogatory # 34.

Upon reflection, we think that the part of that element in Instruction # 26 pursuant to which it was sufficient for Norris to prove that "Allied–Sysco ... reasonably should have known that [Norris] wanted to resume working with a reasonable accommodation" may have gone somewhat further than what is explicitly supported by the available case law. However, the instruction certainly was not plain error, and defendant did not object to it (nor does defendant object to it now). A previous version of the instruction did not contain the phrase in question and simply required Norris to show, as one of the elements necessary to prevail on her ADA claim, that she requested reasonable accommodation from Allied. When the court informed defense counsel

Moreover, an employee is not required to use the phrase "reasonable accommodation" when requesting reasonable accommodation—an employee must merely let the employer know, in a manner that would be understood by a reasonable employer, that the employee has a disability that requires some sort of accommodation in order for the employee to be able to perform his work duties.[19] Once an employee has let an employer know that he is disabled and desires reasonable accommodation, the employer is then obligated to offer reasonable accommodation (if a reasonable accommodation that does not impose undue hardship is feasible), which may entail engaging in an interactive process with the employee to determine what reasonable accommodation(s) would permit the employee to perform the essential functions of his or her position.[20]

These general principles of ADA law suggest another way in which the jury's answer to Special Interrogatory # 24 can be reconciled with the jury's finding in Special Interrogatory # 34 that Allied violated the ADA by terminating Norris. Perhaps the jury thought that Norris's testimony about her conversations with Barbe did not amount to proof by a preponderance of the evidence that Norris "sought to begin working again," but that Norris did prove that Allied had been alerted that Norris was interested in reasonable accommodation, so that Allied's duty to participate in the interactive process had been triggered under the law. More concretely with respect to the facts, the jury may have thought that Norris generally discussed the possibility of working from home or part-time with Barbe, but did not go so far as to actually request that she be permitted to work from home or part-time.

We believe the evidence supports reconciling the jury's answers to Special Interrogatories # 24 and # 34 in this manner, but we need not base our resolution of this issue on this line of reasoning because of our ruling in the previous section. In addition, the use of this line of reasoning to reconcile the jury's answers to Special Interrogatories # 24 and # 34 may be bolstered by the legal impact of Allied's return to work policy.

In this case, a reasonable jury could have concluded from the evidence that Allied had a policy that an employee had to be released to return to work without any medical restrictions before the employee could be permitted to return to work. *See* Facts ¶¶ 46–50. Such a policy would be a *per se* violation of the ADA, as it would fly in the face of the ADA's requirement that employers reasonably accommodate employees with disabilities. *See Hutchinson v. United Parcel Service, Inc.*, 883 F.Supp. 379, 397 (N.D.Iowa 1995) (employer's policy that an employee had to be "100% healed" before being permitted to return to work was a *per se* violation of the ADA[21]).

The evidence in the case at bar supports a finding that Allied's return to work policy prohibited the kind of reasonable accommodation that Norris argues should have been offered to her. In such a situation, the return to work policy could have three possible

---

of the change in the instruction, defense counsel stated that he liked the previous version better but that he did not have any authority showing that the new version was incorrect to give to the court. The court did not, and does not, interpret this statement as an objection.

**19.** *See* Equal Employment Opportunity Commission, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* (1992) at D–46 ("An applicant or employee does not have to specifically request a 'reasonable accommodation,' but must only let the employer know that some adjustment or change is needed to do a job because of the limitations caused by a disability"); *see also Bultemeyer,* 100 F.3d at 1285 ("The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation

but doesn't know how to ask for it, the employer should do what it can do to help").

**20.** *See* 29 C.F.R. § 1630.2(*o*)(3); *see also Bultemeyer,* 100 F.3d at 1285 ("An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer"); 29 C.F.R. § 1630, App. at 351 ("Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation").

**21.** The court in *Hutchinson* held that the plaintiff in that case could not gain any relief from the *per se* violation of the ADA because the plaintiff was not a qualified individual with a disability. *See* 883 F.Supp. at 397–99.

legal impacts on Norris's duty to alert Allied that she required reasonable accommodation, i.e., there are three possibilities as to what the law could be:

Possibility # 1: Where an employer has a policy that *per se* violates the ADA, an employee has no duty to request an accommodation that would be contrary to the policy. The burden shifts onto the employer to offer the employee a reasonable accommodation that would be contrary to the policy. Thus, an employer violates the ADA if the employee could have been reasonably accommodated (without undue hardship) in a manner contrary to the policy but was not. In order to prevail on an ADA claim in such circumstances, an employee would not be required to prove that he or she requested a reasonable accommodation contrary to the policy.

Possibility # 2: Where an employer has a policy that *per se* violates the ADA, and an employee is interested in an accommodation contrary to the policy, the law requires the employee to do very little in order to trigger the employer's duty to offer reasonable accommodation and/or participate in an interactive process to determine what accommodation would be appropriate. In other words, a policy that constitutes or contains a *per se* violation of the ADA effectively lowers an employee's burden of alerting the employer that he or she requires reasonable accommodation, because such a policy is an important factor for a fact-finder to consider in determining whether the employee met that burden. *Cf. Bultemeyer*, 100 F.3d at 1285–86 (factor in court's decisions that employee had met burden of alerting employer to need for reasonable accommodation and that employer was responsible for breakdown in interactive process was that employee may have thought that it would have been futile to specifically request reasonable accommodation after employer told him that he would not receive any special treatment).

Possibility # 3: Where an employer has a policy that *per se* violates the ADA, the policy has no impact on the duty of an employee to request an accommodation that would be contrary to the policy.

We think that a correct statement of the law would be either Possibility # 1 or Possi-

bility # 2. But we are aware of no authority discussing this issue, and it is not necessary for us to rule on this issue because of our ruling in the previous section (§ IV(A)).

## C. *Extended Leave*

Allied argues that the jury must have thought that Allied had a duty to accommodate Norris by extending her leave for an indefinite period, and Allied further argues that such an "accommodation" is not "reasonable" as a matter of law. This two-fold argument fails, because we ruled in § IV(A), *supra*, that the jury reasonably could have concluded, despite its answer to Special Interrogatory # 24, that Norris requested that Allied accommodate her by permitting her to work from home or part-time. There is no dispute that allowing an employee to work from home or part-time may be a reasonable accommodation under the ADA. Since a jury verdict in favor of Norris on her ADA (termination) claim, based on the theory that Allied should have accommodated her by permitting her to work from home or part-time, can reasonably be supported by both the facts and the law and is not inconsistent with the jury's answer to Special Interrogatory # 24, the jury's verdict may not be overturned on the ground that the jury could have reached its verdict based on another theory that was contrary to the law.

However, we feel constrained to make some additional observations about the extended leave issue. In a pre-trial ruling, the court "inform[ed] the parties of its understanding of two legal issues potentially relevant to plaintiff's ADA claim," one of which was the extended leave issue. We stated that "unpaid leave may be a reasonable accommodation under the ADA, if it does not impose an undue hardship on the employer and if it will permit the employee to eventually perform the essential functions of her position." We added that, "[h]owever, the ADA does not require an employer to permit an employee to take an indefinite, lengthy, unpaid leave of absence—i.e., if the employer does not know when the employee will be able to return to duty, the employer is not required to grant an indefinite and lengthy

leave." Final Pre–Trial Order, filed on September 23, 1996, at 6.

Given this ruling, defendant might have expected the court to be receptive to a request for a jury instruction to the effect that the ADA did not require Allied to accommodate Norris by extending her leave at the time she was terminated. However, defense counsel did not request such an instruction, even after plaintiff's counsel argued in closing argument that one of the ways Allied could have accommodated Norris was by extending her leave. Nor did defense counsel object to the contention in plaintiff's closing argument that extending Norris's leave would have been a reasonable accommodation.[22]

The court's pre-trial ruling on the extended leave issue is supported by the following authorities: *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996) (while "a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation," where plaintiff "failed to present any evidence of the expected duration of her impairment," unpaid leave "of indefinite duration" would not be a reasonable accommodation); *Myers v. Hose*, 50 F.3d 278, 280, 283 (4th Cir.1995) (employer not required to reasonably accommodate employee by granting employee leave of indefinite duration to correct disability); *Morton v. GTE North Inc.*, 922 F.Supp. 1169, 1183 n. 11 (N.D.Tex.1996) (court "doubts that indefinite leave could ever be demanded as a reasonable accommodation"); *Pegues v. Emerson Electric Co.*, 913 F.Supp. 976, 981 (N.D.Miss. 1996) (holding that extended leave of absence would not have been reasonable accommodation where employee had already been given nearly entire year of leave to treat injury; stating, "Although it is reasonable for an employer to allow an employee a temporary leave of absence to recuperate from a disabling injury, the court does not believe the ADA requires the employer to extend that leave indefinitely"); *Dockery v. North Shore Medical Center*, 909 F.Supp. 1550, 1560 (S.D.Fla.1995) (while unpaid leave may be a reasonable accommodation under the ADA, "as a matter of law, an employer is not required to grant a one-year leave of absence, and such an accommodation is, on its face, unreasonable"); 29 C.F.R. § 1630, App. at p. 344 (a reasonable accommodation "could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment"). *See also Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1187 (6th Cir.1996) (employer did not have to keep employee, who had returned from disability but whose position had been filled while he had been unable to work, on unpaid medical leave indefinitely until another position for which he was qualified opened up); *McDonald v. Com. of Pa., Dep't of Public Welfare, Polk Center*, 62 F.3d 92, 97 (3d Cir.1995) (stating that "some case law might support the plaintiff's position that an unpaid leave of absence is an appropriate accommodation in some circumstances").

Upon reflection, we are not sure that there should be a *per se* rule that an unpaid leave of indefinite duration (or a very lengthy period, such as one year) could never constitute a "reasonable accommodation" under the ADA. It is not clear why unpaid leave should be analyzed differently from any other proposed accommodation under the ADA. Whether any particular proposed accommodation is "reasonable" should be based on analysis of the specific circumstances in a given case, applying the same criteria the courts apply to other proposed accommodations—such as whether the accommodation would enable the employee to perform the essential functions of his or her position, and whether the accommodation would impose an undue hardship on the employer.

It is possible that an unpaid leave of an indefinite or very long duration (even as long as one year) could be a reasonable accommodation in some circumstances. For example, in the case of a very large employer, with high turnover and many fungible employees, an unpaid leave of an indefinite or very lengthy duration could be a reasonable ac-

---

**22.** Defense counsel also moved for a directed verdict on Norris's ADA claim on a number of specific grounds, but he did not mention the extended leave issue during his argument for a directed verdict on the ADA claim.

commodation if the leave would enable an easily replaceable employee to eventually perform the essential functions of the employee's position and the employer did not incur significant expenses as a result of maintaining the employee in the status of an employee.

With these thoughts in mind, we note that Allied presented very little evidence that extending Norris's leave would have caused it to suffer undue hardship.[23] The only such evidence Allied presented was that Mark Castleman, the person who held the position of "Sysco Brand Manager—Non–Foods—East" (Norris's position, at the time she was terminated, was "Sysco Brand Manager—Non–Foods—West") had to work extremely long hours while Norris was out on disability because, in addition to doing his own job, he had to perform the tasks of Norris's *previous* position of Non–Foods Specialist. However, it is unclear why Allied held Norris's *old* position open during at least part of the time that she was out on disability. Moreover, it could be inferred from the evidence that the position of "Sysco Brand Manager—Non–Foods—West" was a new position created by Allied for Norris not for business reasons but as a result of a government investigation of Allied's equal employment opportunity practices, meaning that keeping Norris's Brand Manager position open may not have inflicted much hardship upon Allied. *See (in part)* Final Jury Instruction # 30C, "Undisputed Facts."

The following two pieces of evidence may also be treated as tending to show that allowing Norris a longer leave of absence would not have imposed an undue hardship on Allied. First, there was evidence that Allied had allowed other employees to remain out on disability for more than a year. *See* Facts

¶ 51. Second, Allied had a "Medical Leave" policy which could be reasonably interpreted as providing that an employee would be permitted to remain on an extended leave of indefinite duration until he recovered, it became clear that he would be unable to return to work, or he resigned. *See* Facts ¶ 50.[24]

Because of our ruling in § IV(A), *supra,* however, we need not decide whether a reasonable jury could have found under the law and the facts of this case that Allied should have reasonably accommodated Norris by extending her leave of absence.

## V. SIGNIFICANCE OF REPRESENTATIONS IN SUPPORT OF NORRIS'S APPLICATIONS FOR DISABILITY BENEFITS

### A. *Judicial Estoppel*

Defendant argues that a reasonable jury could not have concluded that Norris was able to perform the essential functions of her position because her testimony that she was able to work at home during at least some of her disability leave contradicted representations that she and her doctors made on disability applications and "return to work" forms. In a pre-trial motion, defendant asked the court to prohibit Norris, because of the representations on her disability and "return to work" forms, from introducing any evidence supporting her ADA claim. The court denied this motion. In doing so, the court stated, in a pre-trial order,

[T]here is a split of authority on the issue of whether a plaintiff who states that he or she is totally disabled in a disability benefits application is estopped in a suit under the ADA from arguing that he or she was not wholly disabled. This court will not follow cases which hold that the

---

23. "[A]n employer cannot simply assert that a needed accommodation will cause it undue hardship ... and thereupon be relieved of the duty to provide accommodation. Rather, an employer [must] present evidence and demonstrate that the accommodation will, in fact, cause it undue hardship." 29 C.F.R. § 1630, App. at pp. 357–58.

24. The court in *Dockery,* 909 F.Supp. at 1560, stated that its decision that a one-year leave of absence would not have been a reasonable ac-

commodation "may well have been different" if the employee had shown that the employer "had a policy of granting such extended leaves of absence to employees, or that it had in the past, on an *ad hoc* basis, provided such leaves." While the *Dockery* court did not explain this statement, we think that evidence of this sort may either be evidence of lack of undue hardship or may be evidence that persons qualified as disabled under the ADA were discriminated against relative to other employees.

plaintiff is estopped, such as *Cheatwood v. Roanoke Industries,* 891 F.Supp. 1528, 1538 (N.D.Ala.1995), and *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 557 (D.Kan.1995). This court will follow the cases that hold that there is no estoppel, as this court finds persuasive the arguments in those cases that no recognized principle of estoppel, including judicial estoppel, applies to a situation where a plaintiff seeks to present testimony in an ADA suit that contradicts statements in a disability benefits application. *See Dockery,* 909 F.Supp. at 1556–59; *see also Morton v. GTE North Inc.,* 922 F.Supp. 1169, 1181–82 (N.D.Tex. 1996). However, Norris's statements in her disability benefits applications may still be relevant evidence of what her medical condition was and whether and when she sought to return to work. *See Dockery,* 909 F.Supp. at 1559.

Final Pre–Trial Order, filed on September 23, 1996, at 7.

At the time we issued this ruling, we were not aware of an important Ninth Circuit case dealing with the doctrine of judicial estoppel which had been decided several weeks earlier—*Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597 (9th Cir.1996). We discovered this case during our research for this opinion and order.[25] On the authority of *Rissetto,* we must vacate our earlier ruling that judicial estoppel does not generally apply to statements on disability benefits applications, and we must determine whether, based on the standards in *Rissetto* and other relevant authorities, Norris should be judicially estopped in this case from asserting that she was able to perform the essential functions of her position for purposes of the ADA.

Before discussing the governing Ninth Circuit authorities, we will discuss how federal courts across the country have dealt with the issue of whether statements on disability benefits applications that a plaintiff is totally disabled should estop a plaintiff from bringing an ADA claim. During the course of this discussion, we will explain the basis for our previous ruling that judicial estoppel is generally inapplicable in such circumstances.

The cases dealing with the issue of the application of judicial estoppel to statements on applications for disability benefits are best classified into three groups. First, some cases hold (some more clearly than others) that either judicial estoppel, or some other (not clearly specified) principle of law, *per se* bars a plaintiff who has stated on disability applications that he was totally disabled from arguing that he was able to perform the essential functions of his position for purposes of the ADA. *See Pegues v. Emerson Electric Co.,* 913 F.Supp. 976, 981 (N.D.Miss. 1996) ("regardless of the label attached," it is not "legally proper" for a plaintiff to represent in an administrative proceeding that she cannot work and then to argue in court, in support of an ADA claim, that she could have worked with reasonable accommodation); *Cheatwood v. Roanoke Industries,* 891 F.Supp. 1528, 1538 (N.D.Ala.1995) (after collecting disability benefits based on representations that he was unable to perform the essential functions of his job, a plaintiff is estopped from asserting a claim against his employer based on contrary representations); *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 554–56 (D.Kan.1995) (plaintiff could not maintain that she was a qualified individual with a disability for purposes of the ADA after receiving disability benefits based on representations that she could not perform the material duties of her job); *Reigel v. Kaiser Foundation Health Plan of N.C.,* 859 F.Supp. 963, 969–70 (E.D.N.C.1994) (representations by plaintiff and her doctors in support of disability applications to effect that plaintiff's injury was totally disabling precluded reasonable fact-finder from finding that plaintiff was able to perform essential functions of her position for purposes of the ADA, as "statements made for the purposes of obtaining disability benefits were binding admissions" and "plaintiff cannot speak out of both sides of her mouth with equal vigor and credibility before [the] court"). *See also McNemar v. Disney Store, Inc.,* 91 F.3d 610,

---

**25.** Defendant has never cited *Rissetto* to the court. Nor has defendant moved that we consider our earlier ruling on the estoppel issue.

616–19 (3d Cir.1996); *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768, 770–71 (8th Cir.1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988); *Wilmarth v. City of Santa Rosa,* 945 F.Supp. 1271, 1279 n. 5 (N.D.Cal.1996); *Smith v. Midland Brake, Inc.,* 911 F.Supp. 1351, 1358 (D.Kan.1995); *Fussell v. Georgia Ports Authority,* 906 F.Supp. 1561, 1575–76 (S.D.Ga. 1995); *Nguyen v. IBP, Inc.,* 905 F.Supp. 1471 (D.Kan.1995); *Harden v. Delta Air Lines, Inc.,* 900 F.Supp. 493 (S.D.Ga.1995).

Second, other courts, without applying any such *per se* rule, have, after examining the facts in the particular case before them, decided that no reasonable fact-finder could find that the plaintiff could have performed the essential function of his position, at least in part because of statements made by the plaintiff that the plaintiff was totally disabled. *See Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1480–82 (9th Cir.1996) (no reasonable fact-finder could conclude that plaintiff could perform essential functions of position where plaintiff stated on disability forms and doctor testified that plaintiff was totally disabled from working); *August v. Offices Unlimited, Inc.,* 981 F.2d 576, 581–84 (1st Cir. 1992) (no reasonable fact-finder could conclude that plaintiff was able to perform essential functions of job under Massachusetts statute similar to ADA where plaintiff had declared that he was totally disabled on numerous disability applications and there was no contrary evidence to show that plaintiff was not completely and totally disabled during relevant period of time).

Third, other courts have ruled that a plaintiff is not estopped by statements in disability applications from arguing, in support of an ADA claim in court, that he was able to perform the essential functions of his position. *See D'Aprile v. Fleet Services Corp.,* 92 F.3d 1, 3–5 (1st Cir.1996) (plaintiff not barred from claiming handicap discrimination under state statute similar to ADA by representations that she was "totally disabled" within meaning of employer's disability insurance policy); *Mohamed v. Marriott Intern., Inc.,*

944 F.Supp. 277, 280–84 (S.D.N.Y.1996) (it is "inappropriate to invoke the fact-sensitive and limited doctrine of judicial estoppel to erect a *per se* bar to ADA protection for individuals who have also applied for and/or received SSDI [Social Security Disability Insurance] benefits"); *Morton v. GTE North Inc.,* 922 F.Supp. 1169, 1181–83 (N.D.Tex. 1996) ("strict estoppel approach," under which statements in support of disability applications may *per se* bar an ADA claim, is not supported by the case law, but representations in disability applications are factors to be weighed in determining whether a summary judgment motion should be granted [26]); *Dockery v. North Shore Medical Center,* 909 F.Supp. 1550, 1556–59 (S.D.Fla.1995) (judicial estoppel does not apply to statements in administrative filings for disability applications). *See also Overton v. Reilly,* 977 F.2d 1190, 1196 (7th Cir.1992) (finding by Social Security Administration that plaintiff was entitled to disability benefits could not be construed as judgment that plaintiff was not qualified to do his job); *Pressman v. Brigham Medical Group Foundation Inc.,* 919 F.Supp. 516, 522–23 (D.Mass.1996) (plaintiff permitted to maintain handicap discrimination claim despite receiving disability benefits under "total disability" section of employer's insurance policy); *Smith v. Dovenmuehle Mortgage, Inc.,* 859 F.Supp. 1138, 1141–43 (N.D.Ill.1994) (plaintiff not judicially estopped by representations in support of application for disability benefits and by determination of Social Security Administration that plaintiff was entitled to benefits, where these representations and this determination did not contradict plaintiff's assertions that he was able to perform essential functions of his position for purposes of ADA during relevant time period); *Kupferschmidt v. Runyon,* 827 F.Supp. 570, 574 (E.D.Wis.1993).

At the time we issued our pre-trial ruling that judicial estoppel was inapplicable, the case we found most persuasive was *Dockery,* 909 F.Supp. at 1556–59. Relying on 11th Circuit authority, the court in *Dockery* stated

---

**26.** *Morton* would also fit into the second category, as the *Morton* court ruled, after examining the facts of the case, that the plaintiff had not presented sufficient evidence to permit a jury to conclude that he could have performed the essential functions of his position with accommodation. *See* 922 F.Supp. at 1181–83.

that there are two requirements for the application of judicial estoppel: "First, it must be shown that the allegedly inconsistent pleadings were made under oath in a prior proceeding. Second, such inconsistencies must be demonstrated to have been calculated to make a mockery of the judicial system." 909 F.Supp. at 1558. The *Dockery* court concluded that the first requirement meant that the prior assertions had to be made in judicial or quasi-judicial proceedings, not in administrative filings. *Id.* The *Dockery* court concluded that, under the second requirement, unless the inconsistent statements of the plaintiff were calculated to make a mockery of the judicial system, judicial estoppel is an inappropriate sanction. *Id.* at 1559. We found these and other arguments by the *Dockery* court to be persuasive.

At the time of our pre-trial ruling, the only applicable Ninth Circuit authority we were aware of was *Kennedy*, 90 F.3d at 1480–82, which was decided on July 31, 1996. In *Kennedy*, the plaintiff stated in disability applications and the plaintiff's physician testified in deposition that the plaintiff was totally disabled. The only evidence that the plaintiff was able to perform the essential functions of her position was plaintiff's own deposition testimony. 90 F.3d at 1480–82. The Ninth Circuit determined that such "uncorroborated and self-serving" deposition testimony was not enough to raise a genuine issue of material fact and concluded that there was no genuine dispute of material fact that the plaintiff was unable to perform her job during the time period relevant to her ADA claim. *Id.* at 1481. The Ninth Circuit thus affirmed the district court's decision to grant summary judgment against the plaintiff on the plaintiff's ADA claim. *Id.* at 1482.

In a footnote, the *Kennedy* court stated,

[Defendant] and amicus urge us to apply the doctrine of judicial estoppel in this case. Judicial estoppel is an equitable doctrine invoked to protect the integrity of the judicial process. It precludes parties from taking inconsistent positions in *judicial* proceedings. Because we find no genuine issue of material fact in this case, we find it unnecessary to rely on the doctrine of judicial estoppel.

*Id.* at 1481 n. 3 (emphasis added) (citations omitted). We interpreted this footnote as meaning that the issue of whether judicial estoppel should be applicable to statements in disability applications had not been decided by the Ninth Circuit. We also interpreted the *Kennedy* court's statement that judicial estoppel "precludes parties from taking inconsistent positions in *judicial* proceedings" (emphasis added) as suggesting that the Ninth Circuit might be inclined to agree with the *Dockery* court's conclusion that judicial estoppel only applies to statements made in judicial or quasi-judicial proceedings and not to statements in administrative filings.

When we made our pre-trial ruling, we were not aware of *Rissetto*, 94 F.3d 597, which was decided on August 29, 1996. In *Rissetto*, the plaintiff filed a claim for workers' compensation benefits. The plaintiff settled the claim with the workers' compensation insurer, and the insurer agreed to pay plaintiff temporary total disability benefits. The workers' compensation appeals board approved the settlement. The plaintiff received the benefits. The plaintiff then filed a lawsuit against his former employer, alleging age discrimination (based on an alleged constructive discharge) and related claims (dependent on the age discrimination claim). The Ninth Circuit held that the plaintiff was judicially estopped from arguing that she was able to perform her job in a satisfactory manner, meaning that her age discrimination and related claims were barred. *See* 94 F.3d at 600.

The court in *Rissetto* explained that "[j]udicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an inconsistent position." *Id.* The *Rissetto* court added:

The policies underlying preclusion of inconsistent positions are general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings.... Judicial estoppel is intended to protect against a litigant playing fast and loose with the courts.... Because it is intended to protect the dignity

of the judicial process, it is an equitable doctrine invoked by a court at its discretion.

*Id.* at 601 (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991)) (omissions in original).

In *Rissetto*, the Ninth Circuit issued a number of rulings about the reach of the doctrine of judicial estoppel. The court ruled that judicial estoppel was not inapplicable by virtue of the fact that the earlier inconsistent position was taken "in a workers' compensation proceeding rather than a court," and strongly implied that judicial estoppel was generally applicable where the earlier inconsistent statements were made in an administrative proceeding. *See id.* at 604. During the discussion of this point, the Ninth Circuit, in a footnote, cited with apparent approval a number of cases where courts "have estopped litigants who had claimed to be totally disabled in applying for disability benefits from claiming to be 'qualified' under the Americans with Disabilities Act." *See id.* at 604 n. 4.

The Ninth Circuit then held that the fact that the plaintiff had received benefits as a result of a *settlement* with the insurer did not prevent the doctrine of judicial estoppel from applying. *Id.* at 604–05. The Ninth Circuit then "ma[de] it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation." *Id.* at 605.

The court concluded in *Rissetto* that "[i]n applying for workers' compensation temporary total disability benefits in November 1990, plaintiff necessarily asserted that she was unable to work." *Id.* at 600. Relying on the fact that California workers' compensation law provides that an employee is considered totally disabled if he is unable to earn any income, the Ninth Circuit explained that the plaintiff's application for and receipt of disability benefits constituted an assertion that she had a total inability to earn income from any kind of employment and was unable

to work. *Id.* at 605. The court held that, "having obtained a favorable settlement based on her assertion that she could not work, plaintiff was estopped from claiming that she was able to perform her job adequately." *Id.* at 606.

Given the holdings in *Rissetto*, we must vacate our previous ruling that judicial estoppel cannot apply where the earlier inconsistent statements are statements in disability benefits applications. As judicial estoppel is an equitable doctrine invoked by a court in its discretion,[27] this court must exercise its discretion and consider anew whether it is appropriate to invoke judicial estoppel in this case. If we determine that the doctrine should be invoked, Allied will be entitled to judgment as a matter of law on Norris's ADA claim.

There are some facts in this case which weigh in favor of applying judicial estoppel. Norris represented to Principal, in an application for long-term disability benefits which she filled out in early March of 1995, that she was "wholly unable to work." *See* Facts ¶ 10. In support of this application, one of her doctors, Dr. Tan, represented that Norris was, at that time, totally disabled from all work, that he did not expect that Norris would become able to perform her job in the future, and that he did not think that Norris's job could be modified to permit her to work despite her disability. *See* Facts ¶ 12.

Principal informed Norris that it would review her application under the "Total Disability Section" of her life insurance policy. *See* Facts ¶ 13. In June 1995, Norris made inquiries to Allied about the status of her application for long-term disability benefits. *See* Facts ¶ 19. In July 1995, Dr. Tan sent Principal a medical report to support Norris's application for long-term disability benefits. *See* Facts ¶ 20.

In February 1996, Principal approved Norris's application for disability benefits, informing her that her claim was being approved under the "Total Disability Section"

---

27. *See Rissetto*, 94 F.3d at 601; *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991). The Ninth Circuit reviews a trial court's decision about whether to invoke judicial estoppel for abuse of discretion. *United States v. Ruiz*, 73 F.3d 949, 953 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 130, 136 L.Ed.2d 79 (1996).

of her life insurance policy. There is an indication in that letter that Principal had concluded that Norris was "unable to work at any occupation." *See* Facts ¶ 35. Norris accepted the long-term disability benefits from Principal and was receiving them at the time of trial. *See* Facts ¶ 36. In addition, throughout the period of her disability leave, Norris certified in applications for State Disability Insurance that she "continued to be disabled and incapable of doing [her] regular work." *See* Facts ¶ 34 n. 7.[28]

These facts can be interpreted as showing that Norris applied for "total disability" benefits based on representations that she was totally disabled from all work, that she continued to seek approval of this application for benefits throughout her disability leave, and that she received and accepted disability benefits based on a determination that she was totally disabled. Therefore, these facts trouble us, gravely. However, for a number of reasons, we nevertheless decline to apply the doctrine of judicial estoppel in this case.

We note first that there is no clear contradiction (or at least no irreconcilable inconsistency) between Norris's representations in support of her disability benefits applications and Norris's representations at trial that she could perform the essential functions of her position. The only time that Norris or her doctor represented that she was totally disabled was in early March 1995 (in the disability application that Norris signed on March 2, 1995). Norris testified that she began to request to be permitted to work from home or part-time around April 1995. *See* Facts ¶ 24. Norris's condition could have improved between early March of 1995 and April of 1995. *Cf. D'Aprile*, 92 F.3d at 4 (no preclusion of handicap discrimination claim where plaintiff did not claim to have become totally disabled until after her requests for reasonable accommodation were denied).

As for the fact that Norris continued to seek approval of her application for long-term disability benefits in June and July 1995, we note that the specific representations made by Dr. Tan to Principal in July 1995 were not inconsistent with Norris's position at trial and did not necessarily imply that Norris was totally disabled. Tan's report to Principal contained a detailed documentation of Norris's medical limitations and problems that appears to be entirely consistent with Tan's and Norris's testimony at trial. In this report, Tan concluded only that Norris was "unable to perform her duties at her own occupation." [29] *See* Facts ¶ 20. Since the specific representations made to Principal while Norris maintained her attempts to obtain long-term disability benefits were not inconsistent with Norris's position at trial and were much more detailed than the statements in the March 1995 disability application, we do not think that it would be correct to treat the statements in the March 1995 application as continuing to be in force throughout the remainder of Norris's disability leave.[30]

We also think that the fact that Norris eventually received benefits under the "total disability" section of her insurance policy is not necessarily inconsistent with the possibility that she could have been able to perform her job with reasonable accommodation. The insurance policy in *D'Aprile* defined an employee who was "totally disabled" as one who could not "perform the material duties of his/her job for the entirely scheduled work week." 92 F.3d at 4–5. The *D'Aprile* court held that the employee's application for benefits for being "totally disabled" under that policy was not inconsistent with the employee's contention that she would have been able to perform the essential functions of her position if her employer had reasonably ac-

---

**28.** Even though most of the disability applications on which Norris made such statements were not admitted in evidence, we may consider them here, because the applications were appended to the pre-trial motion by defendant that attacked plaintiff's ADA claim, and we are now reexamining our ruling on that motion.

**29.** We will shortly explain why the opinion by Dr. Tan that Norris was "unable to perform her

duties at her own occupation" was not inconsistent with Norris's position at trial.

**30.** We also note that there was evidence that Allied was aware of the details of Norris's medical condition, as Allied had a doctor whom they picked examine Norris to verify her condition. *See* Facts ¶ 14.

commodated her by permitting her to work a part-time schedule. *See id.* at 5.

In this case, we do not know what Principal's definition of "total disability" was. We have searched the record in vain for evidence of such a definition. It would not be proper for us to make any assumptions about what the definition was. *D'Aprile* teaches us that an insurance company's definition of "total disability" may differ from the meaning a layperson might expect to attach to that term. *See also Pressman,* 919 F.Supp. at 522 ("genuine issue of fact exist[ed] as to whether total disability within the definition of [the plaintiff's] insurance policy mean[t] that he was unable to perform the essential functions of the practice of medicine," as there was evidence that the insurance company's definition of "total disability" permitted receipt of benefits "so long as there was some medical restriction on [the plaintiff's] ability to practice all aspects of his subspecialty").[31] The case at bar is thus unlike *Rissetto,* where the term "totally disabled" was defined by the law governing the workers' compensation proceedings through which the *Rissetto* plaintiff received disability benefits. *See* 94 F.3d at 605.

The representations by Norris and Dr. Tan that Norris was "incapable of doing [her] regular work" or "unable to perform her duties at her own occupation" (*see* Facts ¶¶ 20, 34 n. 7), which were made throughout Norris's disability leave, also do not clearly contradict the testimony of Norris and Tan at trial that Norris would have been able to work from home during her disability leave. A statement that an employee cannot perform her regular work or duties is not inconsistent with the position that, if the employee were to be reasonably accommodated through modification of those duties or the manner in which they are performed, the employee would be able to perform the main duties of the job. The representations by Norris and Tan that Norris could not do "her regular work" or "her duties at her own occupation" could be reasonably interpreted as representations that Norris could not perform at her occupation *without reasonable accommodation.*

With respect to the issue of what exactly Norris and/or Tan meant by the statements that Norris could not do "her regular work" or "her duties at her own occupation," we note that there may have been some uncertainty during Norris's disability leave on the part of Tan and even on the part of Norris and Allied about what the essential functions of Norris's new position of Brand Manager were. The testimony at trial by Allied employees who held the position of Brand Manager indicated that the main duties of a Brand Manager were administrative. *See* Facts ¶¶ 38–40. However, the job description of the Brand Manager position that Allied sent to Dr. Grant indicated that the main duties were direct selling, which required extensive driving and lifting, tasks that Norris could not do. *See* Facts ¶ 41, 43. It may be that statements by Norris and/or her doctors about her ability to do her job may have been influenced by inaccurate representations by Allied about what the essential functions of the job were. If this is true, it would not be fair for Allied to gain any benefit on the judicial estoppel front from any such inaccurate representations, as judicial estoppel is an equitable doctrine. *Cf. In re Corey,* 892 F.2d 829, 836 (9th Cir.1989) (judicial estoppel does not apply where the inconsistent assertions of the party were based on fraud by another person or party, mistake, or inadvertence), *cert. denied,* 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990).

In addition, the representations by Norris and Dr. Tan that Norris was "incapable or

---

**31.** *Cf. August,* 981 F.2d at 581 ("As used in insurance contracts, 'total disability' generally means a 'person is incapacitated from performing any substantial part of his ordinary duties, though still able to perform a few minor duties and be present at his place of business'") (quoting *Black's Law Dictionary* 462 (6th ed. 1990)); *Mohamed,* 944 F.Supp. at 283 (Social Security Act "clearly permits a person to receive disability benefits while engaged in a period of 'trial work'") (citing 42 U.S.C. § 422(c)); *Overton,* 977 F.2d at 1195 (Social Security Administration may award benefits based on finding that claimant meets criteria for a listed disability or is unlikely to find work in the general economy, even though there may be some work the claimant can do); *Smith,* 859 F.Supp. at 1141 ("finding of disability by the Social Security Administration can not be construed as a judgment that the plaintiff is unable to do his job").

doing [her] regular work" or "unable to perform her duties at her own occupation" may have been, to some extent, a product of Allied's written "Return to Work Policy," which can reasonably be understood as a policy prohibiting a disabled, ill, or injured employee from returning to work unless he or she is fully recovered and has no restrictions. *See* Facts ¶¶ 46–50. Since such a policy would be a *per se* violation of the ADA, *see supra* § IV(B), Allied should not profit with respect to our decision on the judicial estoppel issue from any impact that the policy may have had on the statements of Norris or Tan.

The second main reason that we decline to apply judicial estoppel in this case and conclude that this case is distinguishable from *Rissetto* is that the plaintiff in *Rissetto* claimed that the defendant discriminated against the plaintiff on the basis of her age, while the claim at issue here is an ADA claim. This difference is important, because where an employee claims to be disabled on applications for benefits but later claims that he was not disabled and was discriminated against because of his age, there is a clear inconsistency. By contrast, in an ADA case, an employee's claim of disability may, as defined by the relevant insurer or government agency, mean only that the employee is unable to work at his regular occupation without reasonable accommodation; such a claim of disability would not be inconsistent with a contention by the employee that he can do his job with reasonable accommodation. Distinctions of this sort are not likely to arise in an age discrimination case. For this reason, it is appropriate for a court to be more cautious about applying the doctrine of

judicial estoppel in an ADA case than in an age discrimination case.

A third factor that leads us to be more cautious about applying judicial estoppel in this case is that the representations by Norris and Dr. Tan in support of her disability applications were not made through oral testimony, after the administration of an oath, during a hearing before a public body, but were written representations made, in the case of the representations that concern us most, to a private insurer.[32] In addition, the statements at issue supporting Norris's disability applications were mainly not affirmative statements made by Norris or Tan but simply brief responses to questions on the disability forms or affirmations of statements on the disability forms. Thus, with respect to most of the representations at issue, the language used was not chosen by Norris or Tan but was already on the disability forms.

Where an employee is merely responding to questions on disability applications, often only checking boxes or filling in blanks which have little room, the employee may not have a fair opportunity to accurately explain the details of the employee's medical condition and ability or inability to work. In such circumstances, considering the equitable principles at the root of the doctrine of judicial estoppel, it may be appropriate to give a plaintiff the benefit of the doubt with respect to whether the representations on the disability applications are truly inconsistent with the assertions made in support of an ADA claim.

A fourth reason supporting our decision not to apply judicial estoppel in this case is that it may not be fair to force an employee

---

**32.** In *Mohamed*, 944 F.Supp. at 283–84, the court pointed out that the doctrine of judicial estoppel "developed in cases where parties made inconsistent representations to two different courts." The court went on to state:

> Although estoppel is sometimes applied to give preclusive effect to administrative agency decisions, the case for application of the doctrine is clearly strongest when the forum and its procedures permit a judgment on the merits after the orderly presentation of evidence in adversarial litigation. . . .
>
> Here, the determination that [the plaintiff] was eligible for [Social Security Disability Insurance] benefits was made pursuant to a pa-

per application, without a formal hearing. . . . The streamlined procedures giving rise to the [Social Security Administration's] determination of disability should, at a minimum, give pause to a court considering barring the courtroom door to a plaintiff alleging employment discrimination.

*Id. Cf. Dockery,* 909 F.Supp. at 1559 & n. 17 (court holds that judicial estoppel does not apply to statements in written administrative filings, but court "does not render any opinion [about] whether judicial estoppel is an appropriate sanction where a plaintiff has, under oath, taken an inconsistent position at an administrative hearing").

who can perform his job with accommodation but who has been refused accommodation by his employer to choose between seeking disability benefits and gambling on the uncertainty of an ADA lawsuit. A reasonable factfinder could conclude from the evidence in this case that, when Norris first applied for disability benefits, Allied had a "Return to Work Policy" based on which employees could expect not to be granted reasonable accommodation, and that Norris continued to seek disability benefits after Allied denied requests by her for reasonable accommodation. Under such circumstances, given the serious financial constraints that an ill or injured employee often may face, it is not clear that it would be equitable to place the employee in the position of choosing between applying for disability benefits or filing an ADA lawsuit that may not be resolved for years. *Cf. Smith,* 859 F.Supp. at 1142 ("Defendant's position [that plaintiff should be judicially estopped by representations in support of disability applications] would place plaintiff in the untenable position of choosing between his right to seek disability benefits and his right to seek redress for an alleged violation of the ADA").[33]

█ As stated earlier, judicial estoppel is intended "to protect against a litigant playing fast and loose with the courts" and "to protect the integrity of the judicial process." *Russell,* 893 F.2d at 1037, *quoted in Rissetto,* 94 F.3d at 601. The reality of this case may be closer to that of a plaintiff driven by financial pressures to both seek disability benefits and inquire about whether she could be permitted to work from home or part-time, rather than that of a plaintiff who intentionally sought to play "fast and loose with the courts" or undermine "the integrity of the judicial process." [34]

Moreover, the drastic sanction of judicial estoppel is not the only way a court can protect against being unfairly or dishonestly

used. A real measure of protection is available by permitting the defendant to introduce as evidence against the plaintiff all of her representations in other settings about her condition or disability. Thus, a defendant can be given (as was the defendant in this case) a full opportunity to use a plaintiff's words or representations against the plaintiff at trial as evidence undermining the persuasive force of her claims in litigation.

Furthermore, in deciding whether or not to apply judicial estoppel in this case, we have certainly paid attention to the danger that the defendant would unfairly be subjected to liability on Norris's ADA claim despite the earlier representations in support of Norris's disability applications. In this case, however, we feel that the defendant was not *unfairly* found liable, because the defendant had a full and fair opportunity to use Norris's earlier representations against her at trial and did in fact aggressively do so at trial.

The last, but certainly not the least important, reason for our decision to decline to apply judicial estoppel in the exercise of our discretion is the somewhat unusual procedural posture in which we are faced with the decision of whether or not to invoke judicial estoppel. The jury has already reached a verdict in this case. The jury deliberated for nearly seven days before reaching its verdict. The jury asked the court numerous questions during its deliberations.

Given the length and nature of the jury's deliberations, the court feels that the jury performed its job carefully, conscientiously, and thoroughly. The jury's verdict in favor of Norris on her claim that Allied violated the ADA by terminating her means that the jury concluded that Norris would have been able to perform the essential functions of her position despite the representations by Norris and Dr. Tan in support of Norris's disability applications. We do not feel that it would

---

33. *See also Mohamed,* 944 F.Supp. at 284 ("The ADA's overriding purpose of encouraging the disabled to seek employment would be thwarted by application of judicial estoppel under the circumstances of this case [where the plaintiff applied for and received Social Security Disability Insurance benefits]").

34. If Norris did indeed make misrepresentations to disability insurance providers, she could be sued civilly (or perhaps prosecuted criminally) for fraud. *Cf. Dockery,* 909 F.Supp. at 1559 n. 16. In any such proceeding, we believe that it would be correct to judicially estop her from contradicting the testimony and assertions she has made in this litigation.

be proper to overturn this conclusion by the jury, given the hard work and long hours the jury put in and the lack of an irreconcilable inconsistency between Norris's position at trial and the representations made in support of her disability applications.

**B. *Could a Reasonable Jury Have Concluded that Norris Could Have Performed the Essential Functions of her Position Despite the Representations in Support of her Disability Applications?***

From the preceding discussion, it should be clear that we have rejected Allied's argument that, due to the representations made by Norris and her doctors on her disability and "return to work" forms, a reasonable jury could not have concluded that Norris could have performed the essential functions of her position. reasonable jury could have concluded that the representations by Norris and Dr. Tan that Norris was "wholly unable" to work in March 1995 were not inconsistent with Norris's position that she was able to perform the essential functions of her position in April 1995 or later, as Norris's medical condition could have improved. A reasonable jury could have interpreted the other representations by Norris and her doctors in disability and "return to work" forms as meaning that Norris could not have performed her regular job *without accommodation*—such an interpretation would not be inconsistent with Norris's position that she *could* have performed the essential functions of her job *with accommodation*.[35]

### VI. SUMMARY AND ORDER

We conclude that Norris did present sufficient evidence to enable a reasonable jury to find that Norris established the essential elements of her claim that Allied violated the ADA by terminating her. We further conclude that the jury's answer to Special Interrogatory # 24 does not represent a finding that Norris did not ask Allied about whether she could work at home or part-time. Finally, exercising our discretion, we hold that Norris should not be judicially estopped, because of statements in support of her applications for disability benefits, from taking the position in this litigation that she could have performed the essential functions of her position.

For the foregoing reasons, the defendant's motion for judgment as a matter of law or for a new trial is DENIED. The verdict shall stand.

IT IS SO ORDERED.

---

**35.** This case is unlike *Kennedy,* where both the plaintiff's statements on her disability forms and her doctor's deposition testimony showed that the plaintiff was totally disabled, and the only evidence that the plaintiff was able to perform the essential functions of her job was her own "uncorroborated and self-serving" deposition testimony. *See* 90 F.3d at 1481. In this case, Dr. Tan, one of Norris's doctors, testified at trial that Norris would have been able to work from home during 1995. *See* Facts ¶ 43. Thus, in this case, the plaintiff's testimony at trial that she could have worked with accommodation was corroborated. Therefore, unlike in *Kennedy,* the plaintiff did present enough evidence to permit a rational fact-finder to find in her favor on her ADA claim.